



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**IN THE EASTERN DIVISION**

TIME_____

SEP 2 8 2012

JOHN P. HEHMAN, Clerk
COLUMBUS, OHIO

ROBERT A. SNEAD
Madison Correctional Institution
1851 State Route 56
P.O. Box 740
London, Ohio 43140-0740

:
:
:
: Civil Case No.
:

**2 : 12 cv 899**

and

:

**JUDGE SMITH**

KEVIN D. DARRAH
Madison Correctional Institution.
1851 State Route 56
P.O. Box 740
London, Ohio 43140-0740

:
:
:

**MAGISTRATE JUDGE KING**

:
:
:

Plaintiffs,

:
:
:

-vs-

:

**TITLE 42 U.S.C. §1983**

**CLASS ACTION COMPLAINT**

:

GARY C. MOHR, Director,
Ohio Dept. of Rehabilitation and Correction,
Sued in his Official and Individual Capacities
770 West Broad Street
Columbus, Ohio 43222

:
:
:

**JURY TRIAL DEMAND**

:

and

:

DR. KRISHER, Member of Collegiate Review
Board, Ohio Dept. of Rehabilitation and
Correction,
Sued in his Official and Individual Capacities
770 West Broad Street
Columbus, Ohio 43222

:
:
:

and

-1-

GARY CROFT, Chief Inspector,                    :
Ohio Dept. of Rehabilitation and Correction,
Sued in his Official and Individual Capacities  :
770 West Broad Street
Columbus, Ohio  43222                           :

                                                :
and                                             :

                                                :
JOHN DESMARAIS, Medical Director,               :
Ohio Dept. of Rehabilitation and Correction,
Sued in his Official and Individual Capacities  :
770 West Broad Street
Columbus, Ohio  43222                           :

                                                :
and                                             :

                                                :
STUART HUDSON, Chief, Bureau of Medical         :
Services, Ohio Dept. of Rehabilitation and
Correction, Sued in his Official and Individual :
Capacities
770 West Broad Street                           :
Columbus, Ohio  43222                           :

                                                :
and                                             :

                                                :
ROBERT WELCH, Administrator, Franklin           :
Medical Center, Ohio Dept. of Rehabilitation
and Correction, Sued in his Official and        :
Individual Capacities
1990 Harmon Avenue                              :
Columbus, Ohio  43223                           :

                                                :
and                                             :

                                                :
DR. ANDREW EDDY, Director, Medical              :
Collegiate Review Board, & Chief Medical
Officer of Ohio Dept. of Rehabilitation and     :
Correction, Sued in his Official and Individual
Capacities                                      :
770 West Broad Street
Columbus, Ohio  43222                           :

                                                :

-2-

and

      :

KAREN STANFORTH, (former) Health Care :
Administrator, Madison Correctional
Institution, Ohio Dept. of Rehabilitation and :
Correction, Sued in her Official and Individual
Capacities     :
770 West Broad Street
Columbus, Ohio  43222     :

      :

and     :

MONA PARKS, Assistant Chief Inspector, Ohio :
Dept. of Rehabilitation and Correction, Sued in
her Official and Individual Capacities   :
770 West Broad Street
Columbus, Ohio  43222     :

      :

and     :

DR. DAVID C. WEIL, (former) Chief Medical :
Officer, Advanced Level Provider, Ohio Dept. of
Rehabilitation and Correction, Sued in his  :
Official and Individual Capacities
321 Tulane Road     :
Columbus, Ohio  43202

      :

and     :

ROD B. JOHNSON, Warden, Madison  :
Correctional Institution, Ohio Dept. of
Rehabilitation and Correction, Sued in his  :
Official and Individual Capacities
1851 State Route 56    :
P.O. Box 740
London, Ohio  43140-0740   :

      :

and     :

      :

-3-

**JONDREA PARRISH, Institutional Inspector,**                    :
**Madison Correctional Institution, Ohio Dept. of**
**Rehabilitation and Correction, Sued in her**                  :
**Official and Individual Capacities**
**1851 State Route 56**                                          :
**P.O. Box 740**
**London, Ohio 43140-0740**                                      :

                                                            :

**and**                                                          :

                                                            :

**RALPH WILSON, (former) Acting Health Care**
**Administrator, Madison Correctional**                          :
**Institution, Ohio Dept. of Rehabilitation and**
**Correction, Sued in his Official and Individual**              :
**Capacities**
**1851 State Route 56**                                          :
**P.O. Box 740**
**London, Ohio 43140-0740**                                      :

                                                            :

**and**                                                          :

                                                            :

**DONALD ROOT, Nurse, Madison Correctional**                     :
**Institution, Ohio Dept. of Rehabilitation and**
**Correction, Sued in his Official and Individual**              :
**Capacities**
**1851 State Route 56**                                          :
**P.O. Box 740**
**London, Ohio 43140-0740**                                      :

                                                            :

**and**                                                          :

                                                            :

**DARHLA ROBERTS, (former) Health**                              :
**Information Technician, Madison Correctional**
**Institution, Ohio Dept. of Rehabilitation and**               :
**Correction, Sued in her Official and Individual**
**Capacities**                                                   :
**1851 State Route 56**
**P.O. Box 740**                                                 :
**London, Ohio 43140-0740**

                                                            :

**and**                                                          :

                                                            :

-4-

MS. K. LAYNE, Nurse, Madison Correctional
Institution, Ohio Dept. of Rehabilitation and          :
Correction, Sued in her Official and Individual
Capacities                                             :
1851 State Route 56
P.O. Box 740                                           :
London, Ohio  43140-0740
                                                       :

and                                                    :

                                                       :

MR. D. MCGONIGAL, Transport Officer,
Madison Correctional Institution, Ohio Dept. of        :
Rehabilitation and Correction, Sued in his
Official and Individual Capacities                     :
1851 State Route 56
P.O. Box 740                                            :
London, Ohio  43140-0740
                                                       :

and                                                    :

                                                       :

MARC STANLEY, Unit Manager, Madison
Correctional Institution, Ohio Dept. of                :
Rehabilitation and Correction, Sued in his
Official and Individual Capacities                     :
1851 State Route 56
P.O. Box 740                                            :
London, Ohio  43140-0740
                                                       :

                                                       :

                                                       :

                    Defendants                         :

                                                       :

                                                       :

                                                       :

                                                       :

                                                       :

                                                       :

## I.  PRELIMINARY STATEMENT

1.  This is a civil rights class action for injunctive relief and damages for deprivations of Plaintiffs' rights to Constitutionally required medical care, safe transportation to and from medical care, and freedom of speech. The Plaintiffs are state prisoners confined in Institutions under the jurisdiction of the Ohio Department of Rehabilitation and Correction ("ODRC").

2.  Plaintiffs are suffering or having been suffering from a myriad of serious medical conditions that the Defendants have failed or refused to treat due to system-wide deliberate indifference to the serious medical needs of Ohio prisoners.

3.  Plaintiffs have been injured and have died from the Defendants' failure to rectify the antiquated means of medical transportation. Plaintiffs are and/or have been shown deliberate indifference by these practices.

4.  Plaintiffs have experienced and continue to experience infringements to their freedom of speech as is protected by the First Amendment of the United States Constitution.

5.  Plaintiffs bring claims under both Federal and State Law. They seek preliminary and permanent injunction prohibiting continued unconstitutional practices and conditions of confinement concerning the lack of adequate medical care, safe transportation to and from medical care, and infringement upon their freedom of speech.

6.  The named Plaintiffs also seek damages.


## II.  JURISDICTION

7.  This is a civil class action authorized by 42 U.S.C. §1983 to redress the deprivation, under color of State Law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. §§1331 & 1343.

8.  Plaintiffs seek declaratory judgment pursuant to 28 U.S.C. §§2201 & 2202. Plaintiffs claim for injunctive relief are authorized by 28 U.S.C. §§2283 & 2284 as well as Rule 65 of the Federal Rules of Civil Procedure.

### III.  VENUE

9.  The Eastern Division of the Southern District of the United States District Court is an appropriate venue under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this district and division.

### IV.  CLASS CERTIFICATION & APPOINTMENT OF INTERIM & CLASS COUNSEL

10.  Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions, with §23(a)(4) requiring that "the representative parties must fairly and adequately protect the interests of the class." As most Courts hold that indigent pro se inmates are inadequate as class representatives, the Plaintiffs request the immediate appointment of interim Counsel and/or Class Counsel (please see enclosed motion titled "Plaintiffs' Motion for the Appointment of Interim and/or Class Counsel").

11.  If the Motion for Counsel is not granted and therefore class certification is not granted, the Named Plaintiffs seek the continuation of their individual claims.

### V.  PARTIES

**A. Plaintiffs**

12.  Plaintiffs Robert A. Snead and Kevin D. Darrah are Citizens of the United States who are confined in an Ohio state prison. Plaintiffs Snead and Darrah are both currently housed at Madison Correctional Institution ("MaCI") in London, Ohio.

**B. Defendants**

13.  Defendant Gary C. Mohr is the Director of ODRC and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Director, Defendant Mohr is responsible for the conception and implementation of the Collegiate Review Board ("CRB") and is responsible for the promulgation of all policies, protocols, formularies and, but not limited to, the customary (unwritten) practices of ODRC.

14. Defendant Dr. Krisher is a member of the CRB and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. Defendant Krisher is personally complicit in the denial of medical care to Ohio prisoners.

15. Defendant Gary Croft is the Chief Inspector for ODRC and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Chief Inspector, Defendant Croft is responsible for the assurance that prisoners' mandated services are properly made available to them. His acquiescence and subsequent approval of the complaints listed herein makes him personally culpable.

16. Defendant John Desmarais is the Medical Director for ODRC and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Medical Director, Defendant Desmarais is responsible for the overall supervision of clinical services rendered at all institutional medical facilities.

17. Defendant Stuart Hudson is the Chief of the Bureau of Medical Services ("BOMS") for ODRC and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Bureau Chief, Defendant Hudson is responsible for the financial aspects of the health care delivered to Ohio prisoners and is personally complicit in the orchestrated denial of medical care to Ohio prisoners.

18. Defendant Robert Welch is the Administrator for the Franklin Medical Center ("FMC"), formerly the Corrections Medical Center ("CMC"), and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Administrator, Defendant Welch is responsible for prisoners' access to FMC. FMC, also known as the HUB, is nearly always a prerequisite stop before medical care at Ohio State University Medical Center ("OSU").

19. Defendant Dr. Andrew Eddy is the Director of CRB and Chief Medical Officer ("CMO") for ODRC and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Director of CRB and CMO, Defendant Eddy has immediate control over the decisions made by the CRB and, as such, has control over the approval of medical care rendered at FMC and at OSU and the approval of upper level medications in the Formularies.

20. Defendant Karen Stanforth was the Health Care Administrator ("HCA") for MaCI and is an agent of the State of Ohio. She is Sued in her Official Capacity and in her Individual Capacity. As HCA, Defendant Stanforth was responsible for the daily administration of health care services rendered at Ma.C.I and played an active role in the CRB processes.

21. Defendant Mona Parks is an Acting Assistant Chief Inspector of ODRC and is an agent of the State of Ohio. She is Sued in her Official Capacity and in her Individual Capacity. As an Inspector, Defendant Parks is responsible for the disposition of appeals to the Chief Inspector that involve medical complaints.

22. Defendant Dr. David C. Weil was the CMO/Advanced Level Provider ("ALP") of MaCI and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As CMO and ALP, Defendant Weil was responsible for the daily medical care of prisoners at the institutional level.

23. Defendant Rod B. Johnson is the Warden of MaCI and is an agent of the State of Ohio. Defendant Johnson is Sued in his Official Capacity and in his Individual Capacity. As Warden, Defendant Johnson is responsible for the administration of the daily operations at MaCI.

24. Defendant Jondrea Parrish is the Institutional Inspector of Services ("IIS") at MaCI and is an agent of the State of Ohio. She is Sued in her Official Capacity and in her Individual Capacity. As IIS, Defendant Parrish is responsible for the disposition of grievances regarding the services provided at MaCI.

25. Defendant Ralph Wilson was the Acting HCA for MaCI and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Acting HCA, Defendant Wilson was responsible for the administration of the daily health care provided to prisoners at MaCI.

26. Defendant Donald Root is a Nurse at MaCI and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. As Nurse, Defendant Root is responsible for the quality and quantity of nursing care that prisoners of MaCI receive. Defendant Root acts as the "Gate Keeper" with regards to any requests to see the CMO.

27.  Defendant Darhla Roberts was a Health Information Technician ("HIT") at MaCI and was an agent of the State of Ohio. She is Sued in her Official Capacity and in her Individual Capacity. As an HIT, Defendant Roberts was responsible for the scheduling of medical care provided at FMC and OSU.

28.  Defendant K. Layne is a Nurse at MaCI and is an agent of the State of Ohio. She is Sued in her Official Capacity and in her Individual Capacity. Defendant Layne is responsible for the quality and quantity of nursing care provided to prisoners at MaCI. Defendant Layne also serves as a "Gate Keeper" with regards to any requests to see the CMO.

29.  Defendant D. McGonigal is a Transportation Officer as well as a Corrections Officer ("CO") for MaCI and is an agent of the State of Ohio. Defendant McGonigal was responsible for the safe transportation of MaCI prisoners to CMC/FMC, OSU, and any other outside facility and then back to MaCI.

30.  Defendant Marc Stanley is a Unit Manager at MaCI and is an agent of the State of Ohio. He is Sued in his Official Capacity and in his Individual Capacity. Defendant Stanley is responsible for the management of his units including, but not limited to, Job Classifications.

31.  All Defendants are employees or contractors of ODRC and all acted under color of State Law.


## VI.    RELATED CASES

32.  Plaintiff Snead has filed actions which rely upon similar facts and/or evidence: (1). Court of Claims of Ohio Case No. 2011-10410 and (2). Madison County Court of Common Pleas Case No. CVA 20120154. For any conflicting claims or claims that are deemed "waived," the Plaintiffs seek only prospective and equitable relief with regards to those claims.


## VII.   CLASS ACTION ALLEGATIONS

33.  This action is brought and requested to be maintained, as a class action under Rule 23(a) & 23(b) of the Federal Rules of Civil Procedure. Plaintiffs Snead and Darrah bring this class action on behalf of themselves and all others similarly situated. The members of the class are as follows:

All Inmates, who have been, will be, or are incarcerated in prisons operated by or under the jurisdiction of the Ohio Department of Rehabilitation and Correction who, while so incarcerated, have been Denied Constitutionally Required Medical Care, have or will be transported to and from Medical Care, or have suffered any infringements upon their freedom of speech.

34. The class is so numerous that joinder of all members is impracticable. While the exact number of class members is unknown, Plaintiffs believe that the class will consist of more than 50,000 people.

35. The Claims of the Named Individuals and Representative Plaintiffs are typical of the claims of the class. Plaintiffs and all class members sustained and continue to suffer injury arising from the Defendants' wrongful conduct as alleged herein.

36. The Named Individuals and Representative Plaintiffs will fairly and adequately protect the interests of the class (please see attached motion titled "Plaintiffs' Motion for the Appointment of Interim and/or Class Counsel"). Plaintiffs request the appointment of Class Counsel who is experienced in the prosecution of class actions, including those arising from the deprivation of civil rights in a custodial setting and cases involving complex litigation.

37. Defendants have acted, or refused to act, on grounds generally applicable to the class, thereby making final injunctive and corresponding declaratory relief appropriate with respect to the class.

38. A class action is superior to other available methods for the fair and efficient adjudication of this litigation, since individual joinder of all members of the class is impracticable. Even if any group of class members themselves could afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties and the Court systems of resolving controversies surrounding Defendants' acts. By contrast, the class action device produces far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single Court.

## VIII.  FACTS CONCERNING DELIBERATE AND SYSTEMIC FAILURES IN ODRC'S HEALTH CARE SYSTEM

39.  There are 33 prisons under the jurisdiction of ODRC, including 2 institutions that are privately operated. There are approximately 50,000 men and women incarcerated in the ODRC's prison system.

40.  The vast majority of medical care offered in ODRC prisons is provided by Doctors, Nurses, and other medical personnel under contract with ODRC. Such contracts are awarded to the medical care providers who submit the lowest bid that is approved.

41.  The Institutions' Chief Medical Officer/Advanced Level Provider ("CMO/ALP") is the Physician responsible for the medical care of prisoners at the institutional level. The Institutional Health Care Administrator ("HCA"), a Nurse, is responsible for the administration, planning, and coordination of health care services delivered at the institutional level.

42.  The recently formed Medical Collegiate Review Board ("CRB") was conceived, designed, and implemented to hinder, deny, lessen, and delay upper level medications and medical care provided at other sources than the institutions, including but not limited to FMC & OSU.

43.  Medical protocol is an official guidance issued by the ODRC Medical Director, with the approval of the Chief of the Bureau of Medical Services, to direct medical procedures or course of action.

44.  Formularies are lists of medications approved for use by the ODRC Medical Director in treating illnesses, conditions, and injuries. Medications that do not appear on the formularies may not be prescribed without prior approval from CRB. Certain classes of medications are not available for use. Less expensive medications take the place of medications with less side effects and a higher success rate.

45.  Similarly situated prisoners are given different medication options based upon their ability to pay for "outside" prescription medications. They are also treated with disparity if they are deemed capable of purchasing the medications they need for chronic conditions and to treat side effects from their prescribed medications at the commissary.

46. The treatment options of the Chief Medical Officer ("CMO") are limited by the decision he can make to comply with medical protocol and the formularies. Additionally, the CMO's decisions are controlled by the prerequisite approvals from CRB.

47. Under ODRC rules, prisoners have no right to a second opinion from any other source as it pertains to medical matters with the sole exception of specialty and surgical referrals to Doctors employed or training interns at OSU. Prisoners are not permitted to be seen by private Physicians or "outside" Doctors.

48. Prisoners are completely dependent upon the Defendants for the delivery of all of their medical care.

49. Prisoners who suffer from chronic illnesses and conditions such as Hypertension, Diabetes, Seizure Disorders, Cardiovascular Problems, Tuberculosis, Chronic Obstructive Pulmonary Disease, HIV Infection, Hepatitis C, and Chronic Liver Disease are to be followed and treated medically in Chronic Care Clinics that address their particular health problems. This process is too often delayed or completely forgotten.

50. Prisoners who have medical needs that cannot be met by the institution's CMO/ALP, pursuant to protocol but, after approval from CRB, are to be referred to Specialists or Surgeons at OSU.

51. Prisoners with complaints about the lack of quality in medical care must use the grievance system codified in Ohio Administrative Code ("OAC") §5120-9-31. The Prison Officials that are responsible for the review and responses of these complaints are not Doctors and, therefore, unqualified to determine whether competent and appropriate care is being provided to individual prisoners.

52. HCAs are the health care authorities responsible for the administration of health care within the Institutions. HCAs are Registered Nurses who assess, direct, coordinate, supervise, and evaluate all health care services delivered at the Institutional level. HCAs play an active role in the functioning of CRB.

53. Although they are not licensed Physicians, HCAs commonly overrule Physicians' orders for Specialists, Surgeons, and tests. HCAs indiscriminately impose lengthy delays when approving the scheduling of appointments for follow-up care.

54. The HCA's lack of care and training is reflected by his/her staff. When the HCA is unqualified and improperly trained for this position, and shows an apparent lack of sensitivity training, his/her staff becomes more abusive towards the prisoners in his/her care.

55. ODRC charges a $2.00 copayment fee if an appointment is scheduled for a prisoner seeking medical care and a $3.00 copayment fee if the appointment is an unscheduled emergency.

56. Taking into consideration that the average prisoner makes $18.00 per month from his mandatory work assignment, the copayment fee is approximately 12% of his/her monthly income for a single visit to medical.

57. The Director, Chief of BOMS, Medical Director, and Dr. Eddy (CMO and Director of CRB) have devised and implanted a standard of medical care which former HCA and now Defendant Stanforth described in this manner: "If a prisoner's condition, illness, or injuries are not immediately life-threatening, then no outside medical care will be rendered for that prisoner."

58. This standard of care falls well beneath what is Constitutionally required.

59. Nurses at the institutional level are to provide the daily nursing care needed by prisoners. Nurses also function as "Gate Keepers" in regards to Doctor visits, chronic care, and follow-up care with the CMO/ALP.

60. HITs are liaisons between the institutions, FMC, and OSU. Additionally, they are responsible for scheduling prisoners' trips for care at those facilities.

61. The CRB frequently denies a Doctor's recommendations for prisoner care based simply on the monetary costs and not the prisoner's well-being or pain and suffering.

62. The overall consistency, quality, and continuity of medical care provided to Ohio prisoners is **grossly substandard** and frequently falls well below the evolving standards of decency and societal norms. This violates and offends the Constitution of the United States. **Systemic problems** include but are not limited to:

**A. Medical staffing shortages:** due to staffing problems, due in part to the Physicians' refusals to work in an environment where medical care is denied to the detriment of the patient, some Ohio prisons

-14-

have gone prolonged periods with a CMO unavailable to see prisoners or with no CMO at all, thus compromising the medical care provided to prisoners. Contract Doctors, Nurse Practitrists, Podiatrists, Dietitians, and other medical staff work far too few hours and see far too many prisoners to ensure that prisoners are seen in a timely manner and have the appropriate amount of time with that particular health care professional as to resolve all issues. These staffing issues seriously endanger the health, safety, and lives of prisoners in need of care.

**B. Excessive and unreasonable delays and denials of health care services:** Prisoners are, and have been, suffering from excessive and unreasonable delays and denials of health care services including, but not limited to, specialty, surgical, and emergency medical services.

**C. Unreasonable delays in receiving diagnostic testing and receiving the subsequent results of testing:** Prisoners routinely encounter extreme delays or denials of necessary diagnostic tests for conditions such as Cancer, Hepatitis C and, but not limited to, life-threatening injuries. There is no viable system in place to inform prisoners of their test results. The subsequent failure to be able to properly treat these conditions endanger the health, safety, well-being, and lives of prisoners.

**D. Highly restrictive protocol for the submission of specialty and surgical consultations or diagnostic testing:** CMOs and Nurses are faced with highly restrictive protocol when trying to order higher levels of care, such as specialty and surgical consultations or diagnostic testing. Nurses must make sure that a prisoner seeking medical attention meets the protocol's criteria before that prisoner may see a Doctor. These practices cause delays and deter prisoners from seeking medical care for fear of refusal of case, thus jeopardizing the health, safety, well-being, and lives of prisoners.

**E. Failure of subordinate medical staff to follow Doctors' orders:** Subordinate medical staff (e.g. Nurses, HITs, and Pharmacists) routinely fail to follow Doctors' orders for scheduling surgeries, diagnostic testing and, but not limited to, medical and prosthetic devices, thereby endangering the health, safety, well-being, and lives of prisoners.

**F. Failure to provide critically ill, chronically ill, and injured prisoners sufficient medical and emergency medical care:** Defendants fail to provide adequate medical and emergency medical care to

critically ill, chronically ill, and injured prisoners. Prisoners have died while attempting to receive care or waiting unreasonably long periods for ambulances and or other emergency care.

**G. Medical equipment is not maintained in operable condition:** Medical equipment such as automated electronic defibrillators ("AED") is not maintained in operable or "ready to use" condition. This unnecessarily puts prisoners' lives in jeopardy.

**H. Infirmaries do not have proper diagnostic equipment:** The Infirmaries of each institution do not have at their disposal basic diagnostic equipment such as hand-held ultrasound devices. Therefore, they rely upon older technologies, such as X-rays, often exposing prisoners to higher levels of radiation without benefit of successful detection of the actual problem. This practice needlessly endangers the health, safety, well-being, and lives of prisoners.

**I. Abusive, surly, and disrespectful medical personnel that lack people skills and *sensitivity training*:** There is no true accountability for the abusive, degrading, and wrongful conduct of the medical staff. The abusive tendencies of the medical staff often deter prisoners from seeking out assistance and thus cause pain, suffering, and the spread of infectious diseases and conditions.

**J. Requiring the Institution Chief Medical Officer to adhere to a less efficacious treatment protocol and formularies to limit medical expenses:** Defendants knowingly endanger the lives and well-being of prisoners by requiring Institution CMOs to provide less efficacious treatments and medications as a way to save money. As a result, the Institution CMOs are making decisions based on ODRC Central Office Monetary considerations rather than the prisoner's best interest.

**K. Adoption of restrictive and ineffective protocol and formularies for the management and treatment of Methicillin Resistant Staphylococcus Aureus ("MRSA"):** Prisoners with MRSA are commonly treated at the institutional level with highly ineffective oral antibiotics as are called for in the protocol. These Carriers of the particularly insidious Bacteria are left in the general population with open, seeping, and uncovered wounds. This condition requires quarantine and intravenous treatment with a more aggressive antibiotic than Methicillin, hence the Methicillin *Resistant* Staphylococcus Aureus. The proper medications are being denied prisoners because of the cost of the quarantine and medications. This

practice shows a total disregard for prisoner safety and endangers the health, safety, well-being, and lives of prisoners.

**L. Refusal to adopt effective quality control measures to ensure competent and safe medical care:** Defendants continue to endanger the health, safety, well-being, and lives of prisoners by their refusal and failure to adopt effective and appropriate quality control measures. Medical grievances are reviewed by ODRC personnel with no medical training. Grievances and appeals must be reviewed by an outside third party, with no bias toward either side. This review should be conducted by a panel of Doctors of many fields, and they should be compensated by a source other than ODRC.

**M. Dangerously unsanitary conditions at Franklin Medical Center ("FMC"):** At FMC many, if not all, "Emergency Call" systems are disabled or non-functioning. The walls of the rooms and bathrooms of those rooms are covered with blood and other bodily fluids. Bed-ridden prisoners who must use urinals, bed pans, or diapers commonly go 24 hours or more without assistance. The plumbing is in such disrepair that there are puddles in most bathroom areas, and they are not properly cleaned. The linens, towels, and gowns are blood-stained. For injured prisoners, most with open wounds, this is a death trap.

**N. Failure of ODRC to restrict the double celling of prisoners with Hepatitis C, HIV, and AIDS with prisoners who are not infected:** Instead of simply double-celling those infected prisoners together, ODRC recklessly endangers the lives, health, safety, well-being, and longevity of non-infected prisoners by exposing them to unreasonable risks of infection.

**O. Failure of ODRC, Defendants, to "Medically Restrict" infectious disease-carrying prisoners from working in food services:** The Defendants routinely *require* prisoners with Hepatitis C, HIV, and active AIDS to work in food service positions. This practice enables the spread of these highly contagious and deadly diseases. This practice shows an utter disregard for the health, safety, well-being, and lives of prisoners.

**P. The administration of the $2.00 medical copayment deters prisoners from seeking necessary medical care:** Even though OAC 5120-5-13(A) states in relevant part "[n]o inmate shall be denied

-17-

needed medical treatment because of the lack of ability to pay," inmates are routinely denied medical care because they cannot afford it due to the $2.00 copayment.

63. The defendants have known for many years of these systemic medical care problems and the fact that these problems put prisoners at substantial risk of serious infectious diseases, physical harm, and death. Defendants however have refused to take the appropriate steps and actions to correct these problems. The Defendants, quite to the contrary, have taken actions to intentionally worsen the problems in order to save money spent on medical care for prisoners.

64. At all times relevant to this action, Defendants have acted with deliberate indifference to the known and recognized serious medical needs of the Named Plaintiffs and the members of the Plaintiff Class. Defendants have permitted the deprivations to continue, participated in said deprivations, or knowingly acquiesced in said deprivations of rights.

65. As a direct result of the Defendants' actions and/or inactions described above, the Named Plaintiffs and members of the Plaintiff Class have suffered and continue to suffer the deprivations of basic Constitutional rights.

66. The Named Plaintiffs and members of the Plaintiff Class are suffering from or have suffered irreparable harm for which they have no adequate remedy at law.

67. The Named Plaintiffs and members of the Plaintiff Class have suffered serious and substantial Physical and emotional injury, pain and suffering, and other injuries and damages.

## IX. FACTS CONCERNING UNSAFE TRANSPORTATION OF PRISONERS FOR MEDICAL CARE

68. When a prisoner is transported, the Defendants use 2 main means of transportation. The first is a fleet of Busses called the Bluebird. These aged vehicles are in disrepair and normally left unsanitary. The only way to describe a round trip is in one word: "beating." The buses' suspension systems need maintenance. For prisoners who have recently had surgeries and other procedures, this ride is a brutal event that jeopardizes their health, safety, and well-being.

69. The second mode of transportation is a fleet of passenger vans. There are two types, both of which have been modified to some degree. The vans used to transport prisoners from OSU to FMC and vice versa have been modified with security features. The seating, however, is forward facing, and some seat belts are available. Some vans are modified to accommodate wheelchairs.

70. The second type of modified van is mainly used to transport prisoners from their home institutions to and from FMC and OSU. These vans have a compartment where the prisoners sit sideways, rather than forward facing, and the vans only have seat belts for wheelchairs.

71. These vehicles are manned by 2-3 "armed and vested" COs acting as Transport Officers. Once at their destination, all officers act as Internal Security for that facility. There may be 14 or more teams of these officers.

72. The Defendants have known of the unsafe transportation for years and have refused or failed to take any actions to correct them. These unsafe practices endanger the health, safety, well-being, and lives of prisoners.

73. The problems of unsafe transportation are, but not limited to, as follows:

**A. A lack of proper safety training for drivers and escorts:** The CO drivers are not given proper safety training and lack supervision and accountability.

**B. Transport Officers are unaware of the physical condition of the prisoners in their care:** Transport Officers are not, by policy, given any medical information about the prisoners they are transporting. While they should always drive with the utmost care, this is even more vital when a prisoner has very recently had surgery.

**C. Transport Officers do not seat belt prisoners securely in their seats:** In most transport vehicles, there are no seat belts; any seat belts in vehicles are not put to use. This extremely dangerous practice puts the health, safety, well-being, and lives of the prisoners in jeopardy.

**D. The security handcuffs, shackles, and belly chains are unsanitary:** Prisoners do all of the cleaning at the prisons. Since prisoners are not permitted to handle these safety devices, they remain unsanitary. On average, a "round trip" to and from a medical facility takes between 9 and 14 hours.

-19-

During this time, a prisoner is cuffed and shackled. After several hours, the restraints begin to cut into inmates' skin. If the previous prisoner to wear the restraints had a MRSA infection, the next prisoner's skin is compromised, and the bacteria can enter. The prisoner's health, safety, and well-being is put in jeopardy.

   **E. Reckless Drivers endanger the safety of prisoners:**  With no real accountability of drivers and escorts in place, there is no control over when a driver leaves FMC, OSU, or any other outside facility. When a driver is in a hurry (on a Friday or a payday, for example), there are no seat belts used, there are sideway seats, an already injured prisoner is being transported, and physical restraints limiting the prisoner's arm, hand, and foot motions are used. The cumulative effects are disastrous for the prisoner. These conditions are unconstitutional and endanger the health, safety, well-being, and lives of prisoners.

   **F. Harsher than necessary security protocol at FMC:**  A prisoner seeking medical care, testing, or consultation required to be performed at FMC or OSU must spend 9-14 hours in a combination of handcuffs, shackles, and/or a belly chain or "black box," depending upon his security level. The unnecessarily harsh requirements and conditions of a "round trip" deter most prisoners from seeking medical care. This jeopardizes a prisoner's health, as his/her conditions can worsen to life-threatening.

   74. The Defendants have known for years of these systemic problems in the transportation of prisoners and the fact that these problems put prisoners at risk of substantial physical harm, infectious diseases, and death. The Defendants, however, have failed or refused to take the necessary actions to correct these problems.

   75. At all times relevant to this action, Defendants have acted with deliberate indifference to the known and recognized serious and substantial risks of injury, acquisition of infectious disease, and death to the Named Plaintiffs and the members of the Plaintiff Class. Defendants have permitted the deprivations to continue, participated in said deprivations, or knowingly acquiesced in said deprivations of rights.

76. As a direct result of the Defendants' actions and/or inactions as described above, the Named Plaintiffs and the members of the Plaintiff Class have suffered and continue to suffer the deprivation of basic Constitutional rights.

77. The Named Plaintiffs and the members of the Plaintiff Class are suffering or have suffered irreparable harm for which they have no adequate remedy at law.

78. The Named Plaintiffs and the members of the Plaintiff Class have suffered serious and substantial physical and emotional injury, pain and suffering, and other injuries and damages.

## X. FACTS CONCERNING THE SYSTEMCI INFRINGEMENT UPON PRISONERS' FREEDOM OF SPEECH

79. A prisoner's freedom of speech is nearly always limited to his ability to voice his opinions and his attempts to enforce his Constitutional Rights. A prisoner does this through the grievance procedures, kites to staff, letters to staff and administrators, etc., and finally, through his voice to the Courts.

80. There exist systemic infringements upon a prisoner's rights to be heard in Ohio prisons. There has been a concerted effort on the part of the Defendants to silence the voices of the prisoners in Ohio.

81. Every Ohio prison has a Library. Inside the Library exists the Law Library. The Ohio Administrative Codes ("OACs"), ODRC policies, and individual institutional policies can only be found in the Libraries. In most institutions' Libraries, a copier is available for prisoner use, at cost to the prisoner.

82. A prisoner's right to redress the deprivations of his Constitutional rights, and his ability to do so through the grievance procedures and the Courts, is a protected right.

83. The infringements upon Ohio's prisoners are, but not limited to, as follows:

**A. The vindictive and retaliatory use of authority to punish a prisoner for exercising his or her freedom of speech:** It is common practice for the Defendants to use any of the following detrimental actions as punishment for a prisoner filing formal or written complaints: (1) a job change to a disciplinary position; (2) review all of the prisoner's mail, thereby slowing delivery time; (3) changes in the eating or

shopping order of the complainer's block; (4) a "shakedown" of the complainer's cell and destruction of his/her personal property; (5) a "2.4" inspection of the prisoner's belongings; (6) and/or accusing the prisoner of any number of violations.

**B. Violation of a prisoner's right to privacy:** The Defendants routinely make a public disclosure that the new policy or change was implemented because of a specific prisoner's complaint, thus putting the prisoner in harms' way of retaliation from other prisoners.

**C. Violation of other Constitutional Rights in retaliation:** For prisoners who complain about the lack of medical care or question the judgment of a Doctor, the normal retaliation may include (1) the prisoner not receiving any medical care for an extended period; (2) the prisoner being required to endure numerous "round trips" in order to see a Doctor for simple matters such as writing a prescription.

**D. No meaningful access to the Libraries:** Defendant Mohr, Director of ODRC, has ordered his subordinates not to replace key Library personnel when they retire or leave. The governing policy 58-LIB-01 states that other personnel should "fill in" as needed to meet the minimum operational hours. Even with the new non-union workers, the Library is still not being staffed adequately. The Library is the only place a prisoner may review or make copies of policies (OACs, ODRC policies, or individual Institutions' Policies) or copies of the required attachments for grievances and appeals to the Chief Inspector. Even when prisoners can gain access to the Libraries, many resources are outdated. (For example, the phone directories and legal directories at MaCI are from 2006). Information like OACs must be found online through Lexis, and there are only 2 terminals per 1200 prisoners at MaCI.

**E. Failure to properly supervise corrections staff and a lack of supervisory skills and oversight to do so:** The Defendants are not subject to any true accountability for their actions in the violations of prisoners' Constitutional Rights. For example, Defendant Parks was instrumental in the violation of prisoners' Constitutional rights, when she was the HCA of Southern Ohio Correctional Facility, prior to 2005. Instead of being disciplined or terminated, she was given a better position, with better pay, and moved further away from contact with Ohio prisoners, while she continues to violate prisoners'

Constitutional Rights to adequate medical care. This perpetual practice by the Defendants provides an environment ripe for abuses and serves to infringe upon Ohio prisoners' freedom of speech.

**F. No advocacy for prisoners from the Chief Inspector, Assistant Chief Inspector, and Institutional Inspectors:** The Chief Inspector, Assistant Chief Inspectors, and Institutional Inspectors are to act as advocates of Ohio prisoners to ensure they receive the services mandated by the United States Constitution, the Ohio Constitution, Ohio Laws, OACs, ODRC policies, and individual Institutional Policies. However, there is no meaningful review of a prisoner's complaints. This review should be performed by an "outside" agency that is not dependent upon the Defendants for its funding and is not answerable to the Defendants for its decisions. The continual denials of obviously meritorious claims run rampant in this environment. These practices violate the right to freedom of speech of Ohio prisoners.

**G. Internal mail is not delivered quickly enough to comply with the grievance procedures:** Since Defendant Mohr's implementation of the January 2012 lower-paying position in the institutions, mail rooms have been 5-12 days behind in delivering internal mail which is used to file and receive informal complaints, formal grievances, and appeals to the Chief Inspector. This tardiness in internal mail service causes the untimeliness and subsequent denials of otherwise meritorious claims, thus creating an infringement upon Ohio prisoners' right to freedom of speech and thereby causing them harm.

**H. Surprise moves from Institution to Institution as *terror-tactics* to inhibit prisoners' use of grievance procedures:** The use of the previously discussed transport vans is not confined to medical transports. When certain "special security moves" take place, the Defendants "lock down" specific camps and bring the vans onto those compounds to move specific prisoners from one institution to another. The Defendants use these moves as opportunities to move prisoners who frequently use the grievance system, as well as prisoners who have been helping other prisoners with their grievances and legal struggles, to other institutions. This practice is used to terrorize prisoners in an attempt to inhibit their use of the grievance system. These practices infringe upon the Ohio prisoners' right to free speech.

84. The Defendants have known of and used these practices for years. They have continued to use these methods for the systemic control of Ohio prisoners' freedom of speech. The Defendants have known that, in silencing the voices of prisoners, they put the prisoners at substantial risk of physical harm, infectious disease, and death because the prisoners cannot openly voice their needs and concerns. The Defendants, however, have failed and/or refused to take the necessary actions to stop or prohibit these practices.

85. At all times relevant to this action, Defendants have acted with malice of forethought, in a vindictive and retaliatory manner, and with deliberate and callous indifference towards the Named Plaintiffs and members of the Plaintiff Class. Defendants have permitted the deprivations to continue, participated in said deprivations of rights, or knowingly acquiesced in said deprivations of rights.

86. As a direct result of the Defendants' actions and/or inactions as described above, the Named Plaintiffs and members of the Plaintiff Class have suffered and continue to suffer for the deprivations of basic Constitutional Rights.

87. The Named Plaintiffs and members of the Plaintiff Class are suffering or have suffered irreparable harm for which they have no adequate remedy at law.

88. The Named Plaintiffs and members of the Plaintiff Class have suffered serious and substantial physical and emotional injury, pain and suffering, and other injuries and damages.

## XI. FACTS RELATING TO THE NAMED PLAINTIFFS

### A. ROBERT A. SNEAD:

89. Robert A. Snead is a 49-year-old prisoner who is and has been incarcerated at Madison Correctional Institution ("MaCI") since on or about June 26th, 2008.

90. Plaintiff Snead suffers from, but not limited to, the following conditions and/or injuries:

A. A left inguinal hernia and the subsequent re-injury of that repaired hernia, which manifests itself in, but not limited to, the following manners:

1. Debilitating pain, radiating from the torn tendons at the left hip through the surgical site and into the left testicle; this pain worsens with any activity.

2. Limited or loss of mobility and full range of "unassisted" motion in the affected muscles and the left leg, contributing to the accelerated deterioration of the left hip joint.

3. Severe pain when sitting upright and the tendency for the entire area to seize up and cause great pain and lingering stiffness.

4. A noticeable section of muscle that is separated from the main mesh patch.

5. The muscles at the surgical site are hard, tight, and painful to the touch, with a burning through the entire site, starting at the fused incision site and outward and traveling through the left testicle and hip at the torn tendons.

6. The entire site bulges and hardens even more when Snead stands, causing a sharper pain.

7. The inability to perform at more than 30% of the activities he enjoyed prior to the lack of adequate medical care.

8. Difficulty in bowel movements and a constant feeling that he must urinate.

B. Congenital defects to the right hip joint that has deteriorated at an accelerated rate due to the inability to use the muscles at the hernia repair site more effectively.

C. Injury to the right knee that causes constant pain and a noticeable limp.

D. Gastrointestinal problems that manifest themselves in the following manners:

1. Chronic Gastritis causing GERD, which causes further injuries to the esophagus, lungs, and throat from the acid discharged from the stomach.

2. A strained esophagus that causes constant pain.

3. Nausea and a constant burning hunger pain.

E. Chronic sinus infection that is deteriorating the sinus cavities.

F. Chronic debilitating headaches or migraines.

G. Complications from medications including, but not limited, to the extended use of proton pump inhibitors (Omeprazole).

H. Congenital defects of the left femur, causing it to be 1⅜ inches shorter than the right femur and leg.

**1. Chronological events of Plaintiff Snead's medical claims:**

91. Plaintiff Snead has suffered from a chronic sinus infection since approximately 2006. A surgery was performed in 2007 to remove polyps from Snead's sinus cavities, yet the infection continues to degrade the sinus structure. There is no current treatment being provided.

92. In approximately September of 2008, Plaintiff Snead was seen at CMC, now FMC, by Orthopedics. They determined that Snead's left hip would need to be replaced, but at a future date.

93. Plaintiff Snead started to experience stomach problems in late 2009 from the usage of Indomethicin for pain. Snead has been taking Omeprazole (generic for Prilosec) since that time.

94. In approximately February of 2010, Snead started to experience burning of his esophagus, lungs, and throat.

95. Plaintiff Snead injured his right knee in late March of 2010, while performing a mandatory work assignment. Plaintiff Snead sought medical care from MaCI staff in April of 2010 for the damaged knee, but none was given.

96. During late Spring to early Summer of 2010, Snead suffered a left inguinal hernia during the course of a mandatory work assignment. Snead did not seek immediate medical care, as he believed it would heal by itself.

97. On or about August 3ʳᵈ, 2010, Plaintiff Snead was seen at MaCI by Dr. Elizabeth Holcomb. At this time, Dr. Holcomb ordered an MRI for Snead's right knee, which was ultimately declined, and a Gastro-consult.

98. On or about early September of 2010, Snead was seen in nurse sick call for the now extremely painful left inguinal hernia. Snead was referred to Doctor's sick call to be examined and was given a medical lay-in.

99. On or about October 14ᵗʰ, 2010, Snead was seen by Dr. Elizabeth Holcomb and/or Defendant Dr. David Weil for examination of the left inguinal hernia. At this time, Snead was ordered a "general surgery

consultation" as well as a work restriction of no more than 10 minutes standing and no lifting of more than 5 pounds.

100. On or about November 5th, 2010, Defendant Weil submitted a request for approval of the left inguinal hernia surgery.

101. On or about November 10th, 2010, Snead had a telemeds conference with General Surgeon, Dr. Lindsey. Dr. Lindsey agreed that there was a need for surgery and that Snead would need to see the Anesthesiologist before the surgery, as aesthesia had made Snead ill in prior surgeries.

102. On or about December 1st, 2010, Defendant Weil performed a pre-op physical of Snead and cleared him for surgery. This clearance was never submitted to the surgical team. At or about this date, Defendant Weil ordered the surgery to be scheduled and performed.

103. On or about December 13th, 2010, a medical clearance for surgery was again ordered.

104. On or about January 10th, 2011, Snead had a second telemed conference with Dr. Lindsey and a member of his team. There was confusion as to the meeting with the Anesthesiologist, and the medical clearance was never received. Nurse Smith faxed it to them in Snead's presence, while he was in conference with them.

105. On or about January 11th, 2011, Snead had the Gastro-consult via telemeds with Dr. Levine. Dr. Levine ordered an upper gastrointestinal endoscopy to be performed.

106. During this time, from January forward, Snead started experiencing debilitating Migraine-type headaches for which Defendant Weil prescribed Imitrex.

107. Approximately around this time, the Collegiate Review Board ("CRB") was implemented and all prior approvals for "outside" medical attention were rescinded and had to be resubmitted. Defendant Roberts failed to resubmit Snead's surgery for approval, and thus the surgery was not scheduled.

108. On or about February 2nd, 2011, Defendant Weil again ordered the left inguinal surgery to be scheduled. Again Defendant Roberts failed or refused to schedule it.

109. On or about March 30th, 2011, Defendant Weil ordered the left inguinal hernia surgery to be scheduled. Again Defendant Roberts failed or refused to schedule the surgery.

110. On or about April 5th, 2011, CRB approved the left inguinal hernia surgery, for a second time (the first approval was from Permidian?). Again Defendant Roberts failed or refused to schedule the surgery.

111. On April 11th, 2011, Plaintiff Snead received a Cortisone shot in his right knee. The shot was administered by Defendant Weil.

112. On June 2nd, 2011, Plaintiff Snead met with Defendant Parrish in her office at MaCI. She informed Snead that a full medical history was required before the surgery could be scheduled, as it needed medical clearance from Defendant Weil. (Please see Sections 102, 103, and 104, where Snead was present and personally saw the verification of the receipt of this clearance some 6 months prior.)

113. On June 14th, 2011, Plaintiff Snead was transported to FMC for surgery prep for June 15th, 2011, surgery.

114. On June 15th, 2011, Snead's left inguinal hernia repair was performed by General Surgeon Dr. Lindsey and his team at OSU. Approximately 2 hours after surgery, Snead was transported, unsecured, in a black transport van with front facing seats and seat belts, from OSU to CMC (now FMC).

115. On June 17th, 2011, Snead was ordered into a white transport van with side-facing seats. The van was driven by Defendant McGonigal. Snead was in a belly chain, with handcuffs to that chain, and in shackles. Snead was not seat-belted in. Also in the van were Prisoner John Thomas and Escort Officer B. Carter.

116. As the van entered a highway, just minutes from FMC, another van cut out in front of it. Defendant McGonigal applied the brakes heavily and abruptly, causing a rapid deceleration. Plaintiff Snead was forced to brace himself the only way he could, by pushing against the opposite side of the van with both legs. Consequently, the internal sutures at the left inguinal hernia repair site ripped apart.

117. Upon arrival at MaCI, Snead was seen that day at approximately 2:00 p.m. by Nurse Frost. Snead asked Nurse Frost if he saw fresh blood at the surgical site. Frost stated "No" and attempted to remove the plastic covering over the site. However, the steri-strip stitches stuck to the plastic covering, so he stopped attempting to remove it.

118. On or about June 18th, 2011, Snead was sent to medical by Officer B. Goode. Snead was experiencing what he thought to be extensive internal bleeding at the site running down his left leg and into his groin as well.

119. Snead was seen by two unidentified Nurses, an older male and a female. They examined Snead together. Both stated that it was a "brutal and archaic surgery" and that it was "normal." Snead was sent back to his unit without further medical care.

120. On June 20th, 2011, Snead was seen by Defendant Dr. Weil., who removed the plastic covering, while reapplying the sutures. When Snead asked about the internal bleeding, Defendant Weil stated that it was "normal." Snead left without further medical care.

121. On or about June 22nd, 2011, Snead was again sent to medical by Officer B. Goode. At this point, Snead had a protrusion at the surgical site that was about the size of an orange or a softball, and he was in great distress. Snead was seen and visually examined by Defendant Nurse Root. Defendant Root stated to the effect that he would need to call the Doctor (Dr. Weil) and that Defendant Root did not know if Defendant Weil would send him out immediately but that he would want to do something.

122. Defendant Root called Defendant Weil in Snead's presence, and Defendant Root instructed Snead to remain silent during the call. Root informed the Doctor that Snead had a protrusion at the surgical site that was the size of an orange or a softball. Root stated that the Doctor said it is "normal" and that the Doctor said to tell Snead not come back to medical unless he cannot get to "chow" (the cafeteria) and that the Doctor would see him next week.

123. At this point, Snead confronted Defendant Root and stated, "So, you're not going to do anything?" Root stated, "I have my orders," and he sent Snead back to his housing unit without medical care.

124. On or about June 22nd, 2011 Plaintiff Snead asked Prisoners Carl Straight Junior and Walter Dickenson to view the protrusion. This took place in the porter closet in Washington Alpha Unit at approximately 8:30 p.m.

125. On or about June 27th, 2011, Snead still had not seen a Doctor but, while going through medical to pick up pain medications, he was stopped by Officer Follrod, pulled into an exam room, and examined by Nurse Wolfe. Nurse Wolfe tried to manipulate the now-softball-size protrusion without success.

126. Nurses Wolfe and Hussey immediately notified Defendant Weil by phone. Defendant Weil again stated that it was "normal" and that he would see Snead in a few days. Snead left medical, again without medical care.

127. On or about June 30th, 2011, Snead was seen by Defendant Weil. When Defendant Weil saw the protrusion, which was now the size of a softball or grapefruit, he stated to the effect, "Has it always been like this?" To which Snead replied, "Why do you think your Nurses have been calling you?" Defendant Weil stated that he "could not drain any fluid" from the protrusion without an ultrasound to tell if there was bowel in the protrusion. Defendant Weil ordered the ultrasound and cancelled the pre-approved follow-up appointment with the Surgeon, Dr. Lindsey. Snead was sent back to his unit without medical care.

128. On July 4th, 2011, Snead was seen in Nurse sick call by Nurse Wolfe. Snead was again examined and stated that he would like the Ultrams (pain medications) reordered. Nurse Wolfe scheduled Snead to see the Doctor the next day.

129. Snead was scheduled to see Defendant Dr. Weil on July 5th, 2011. Defendant Weil did not see Snead.

130. On July 7th, 2011, Snead was scheduled to see Defendant Weil. Snead did not see any Doctor.

131. On or about July 8th, 2011, Snead was seen in Nurse sick call by Nurse Kinsler. She examined Snead, noted that he was in significant pain, and noted that there was a protrusion and there were irregularities at the surgical site. She stated that she would put the request for pain medications in front of Defendant Weil.

132. Defendant Weil refused or failed to fill the prescription for Ultrams.

133. On or about July 13th, 2011, Snead was taken to FMC for an ultrasound of the surgical site.

134. On or about July 21st, 2011, Snead was seen by Defendant Weil and informed that all that remained of the protrusion was a significant blot clot. At this point, Defendant Weil wrote an order for 21 days of 81 mg. enteric-coated aspirin to dissolve to blood clot and 50 mg. Ultrams 3 times daily for 21 days for pain.

135. At this time, Snead asked why he had not seen the Surgeon for the follow-up visit. Defendant Weil stated that he had cancelled it, as he had done the follow-up.

136. Defendant Weil ordered a follow-up appointment with him in 30 days.

137. On September 1st, 2011, Snead had not been seen and was without pain medication. He went to Nurse sick call and was seen by Nurse Curtis.

138. Approximately an hour later on September 1st, 2011, Snead was called back to medical and examined by Defendant HCA Stanforth. She stated to the effect that it was a "good-looking surgery site," he "should be proud," and that she wished "they all turned out that good." She informed Snead that she would do some online research about the problems he was experiencing and she would get back to him. She also stated that he would see the Doctor soon and that they would "leave it to the experts."

139. On or about August 24th, 2011, in Snead's absence, Defendant Weil reviewed Snead's file and decided he did not require the upper gastrointestinal endoscopy ("EGD"), previously ordered by Gastroenterologist Dr. Levine (appearing in Paragraph 105 of this document).

140. On or about September 20th, 2011, Snead was seen in Nurse sick call by Defendant Nurse Layne. Snead asked why he still had not seen a Doctor, and Defendant Layne stated, "You will not see the Doctor any time soon, unless it becomes immediately life-threatening." Snead left without medical care.

141. On November 9th, 2011, Snead was seen by a Doctor for the first time since July 21st, 2011. At this time, Defendant Weil refused to schedule the EGD but did agree to pain management. When confronted about the myriad of functional problems Snead complained of with the left inguinal hernia site, Defendant Weil's response was to the effect of "that's something you'll have to learn to live with."

142. On November 28th, 2011, Snead met with the Dietitian and was ordered 6 small meals per day.

-31-

143.  Between December of 2011 and April of 2012, Snead met with the Podiatrist 4-5 times, attempting to get the necessary shoes made for the 1⅜ inch difference between the left and right legs. Snead requested at every appointment to be sent to FMC to achieve this, and the Podiatrist stated that he was not permitted to send anyone to FMC, that every request was being denied. At the last meeting with the Podiatrist, Snead simply asked that the Podiatrist submit the request, even if it were denied.

144.  On or about December 1st, 2011, Snead met with Defendant Weil. At this time, Defendant Weil ordered an Hopylori blood test in lieu of the EGD, and he prescribed 1 month supply of Omeprazole and 3 months' supply of Topirimate for Snead's headaches.

145.  On December 11th, 2011, Snead had the blood test performed for the Hopylori, and the test came back negative.

146.  On January 18th, 2012, Snead met with Defendant Weil. At this time, Defendant Weil stated that he did not think Snead had stomach problems, but that he thought the problems were from bullets lodged near the skin in Snead's back on the left side. Defendant Weil refused the Omeprazole and prescribed Pepcid at the over-the-counter strength, informing Snead he was "free to buy the Prilosec at the commissary." At this time, Snead turned into Defendant Weil all of the Topirimate he had and told Defendant Weil it hurt him too much to take and that it did not help.

147.  On February 22nd, 2012, Snead met with a new CMO/ALP, Dr. Nathan Yost. At this time, Dr. Yost performed a physical examination of Snead and submitted a request for a surgical consultation with regards to the left inguinal hernia site. This request was subsequently refused. Dr. Yost also stated that he was not permitted to write an order for Omeprazole, as Snead had not had the required EGD.

148.  On March 14th, 2012, Snead met again with Dr. Yost. At this time, Dr. Yost requested clearance for the EGD and wrote a 90-day order for the Omeprazole.

149.  On or about March 25th, 2012, the CRB approved the request for an EGD.

150.  From approximately April 12th through April 17th, 2012, Snead was at FMC and had an EGD performed on April 13th, 2012.

151. The EGD revealed Chronic Gastritis, GERD, and a Strained Esophagus. There were three biopsies taken from Snead's stomach, esophagus, and throat.

152. On June 7th, 2012, Snead was scheduled to see Dr. Stephens, a temporary CMO/ALP from an agency, but she did not show.

153. On June 12th, 2012 Snead met with Dr. Stephens and was physically examined for the left inguinal hernia site. Dr. Stephens stated to the effect that the surgery had been submitted and declined and all she could do was to rewrite Snead's pain medications, which she did.

154. Snead's medical conditions leave him in constant debilitating pain, with a loss of use and range of motion that alter how he lives his day-to-day life in a substantial manner. The Defendants have and continue to show deliberate indifference to Snead's medical needs.

## 2. Snead's unsafe medical transportation claims:

155. At all times relevant herein, when Snead was transported, he was in handcuffs attached to a belly chain and shackles. At all times relevant herein, when Snead was at FMC and in a holding cell, he was in handcuffs and shackles.

156. Round trips from MaCI to FMC were approximately 9 hours. On every round trip Snead took in which he was not admitted to the medical facility, he spent the entire time in handcuffs and shackles.

157. When restraints were left on the skin for 9 hours, they cut into the skin and bruised the flesh underneath.

158. Snead was never seat-belted in any form of medical transport.

159. On June 17th, 2011, Snead was transported by Officers McGonigal and Carter from FMC to MaCI. Officer McGonigal was the driver.

160. Snead and Prisoner Thomas were loaded, unsecured by seat belts, into a white transport van with seats that faced sideways.

161. As the van entered a highway, another van cut out in front of it. Defendant McGonigal decelerated rapidly.

162. Before leaving FMC, Officer McGonigal had rushed Prisoner Thomas to finish his lunch so that the prisoners and COs could leave early.

163. June 17th, 2011, was a Friday and a payday for Officer McGonigal.

164. When the van decelerated rapidly, Snead was forced to push off of the opposite side of the van to keep from crashing into the front cage. When Snead did this, he ripped internal sutures and caused a softball-sized hematoma/seroma.

165. This softball-sized hematoma/seroma caused the tendons to tear at the left hip, a section of muscle to tear loose from the main patch, the incision site to fuse to the main patch and, as the hematoma was present for nearly a month, for the entire patch to heal poorly.

166. Transport Officer McGonigal was clearly in a reckless hurry at the time of the incident. He showed a wanton disregard for the prisoners in his care. Officer McGonigal's deliberate indifference for Snead's safety caused Snead's injuries.

### 3. Snead's claims of infringements upon his freedom of speech:

#### A. Defendant Marc Stanley's actions:

167. The animosity Defendant Stanley showed toward Plaintiff Snead began when Snead asked Stanley to add a promised porter position to the 24/7 position Snead held or, in lieu of such addition, increase Snead's pay. Defendant Stanley refused, and Snead filed an informal complaint on March 3rd, 2010. This went through the entire complaint process, and the determination was that Stanley did not violate a policy; therefore, no relief was given.

168. On or about April 5th, 2010, Snead sent 3 identical letters to Ms. Workman, the unit management administrator, Defendant Parrish, and Defendant Stanley, requesting the addition of another porter. Defendant Parrish and Ms. Workman both state they would speak with Defendant Stanley about adding the position. Stanley refused to do so, and Snead let the matter rest.

169. On or about September 12th, 2010, Snead spoke with his immediate supervisor, Block Officer Salsgiver, informing him that Snead was not physically capable of continuing the position and asking for

-34-

a lighter duty position. Officer Salsgiver was unable to find another prisoner for Snead's position, so Snead was required to continue working while injured.

170. Snead sent 3 letters to Ms. Workman, Defendant Parrish, and Defendant Stanley, telling them he was hurt and asking that they move the property cart porter position to another block so that the position could be more easily filled. The response from Defendant Parrish was, basically, that it was not her job. Defendant Stanley took nearly a month to respond, and he was agreeable to the proposition. Ms. Workman did not help. Therefore, Snead sent a Kite to Major Berchtold, who also refused to help.

171. On or about October 3rd, 2010, Snead received a medical lay-in, meaning he was not required to work at all.

172. On or about October 14th, 2010, Snead received medical work restrictions of no more than 10 minutes standing and lifting no more than 5 pounds. Snead was assigned to the "pool table" in the Washington Alpha unit, and somehow he was sent to Job Reclass, conducted by Defendant Stanley, on or about October 20th, 2010. Defendant Stanley made reference to the paperwork Snead had filed and said the medical restrictions did not allow Snead to perform enough work to get paid. He then reclassed Snead as "unassigned" until surgery and recovery were completed.

173. On December 1st, 2010, after Snead's medical restrictions had expired, Snead was again called to reclass by Defendant Stanley and was reclassed to a disciplinary position in the kitchen.

174. Snead presented Defendant Stanley with a health service request form from Defendant Roberts, dated November 27, 2010, which stated that surgery was pending being scheduled. Defendant Stanley's response was to the effect of "that's something you'll have to take up with medical."

175. When Snead protested Defendant Stanley's retaliatory and vindictive actions, Stanley became irate and belligerent, ordering Snead to sign for the action, without seeing it, and leave. Snead signed under protest and duress.

176. Defendant Stanley's actions were clearly in retaliation for Snead's use of his first amendment right to freedom of speech through his writing of complaints and correspondence with other staff members.

**B. Defendant Dr. Weil's actions:**

177. The animosity Defendant Weil showed toward Plaintiff Snead started after Snead's surgery to repair the left inguinal hernia. When Defendant Weil refused to see Snead and take action to reduce the hematoma's effects, Snead started to complain in writing.

178. On June 30th, 2011, Snead filed an Informal Complaint with Defendant Stanforth. Snead filed an Official Grievance with Defendant Parrish on July 14th, 2011, and an appeal to Defendant Parks on August 9th, 2011.

179. Defendant Weil refused to see or treat Snead from approximately July 21st, 2011, through November 9th, 2011. This was in retaliation for Snead exercising his freedom of speech.

180. On or about January 18th, 2012, Snead met with Defendant Weil, who had been prescribing Topirimate to Snead. At this meeting, Snead told Defendant Weil that the Topirimate was hurting his stomach badly, and he turned in his supply of Topirimate to Defendant Weil. Unbeknownst to Snead, Defendant Weil wrote a prescription for over-the-counter strength Pepcid and discontinued both the prescription strength Omeprazole and the ranitidine ("Zantac").

181. Defendant Weil did this in retaliation for Snead's complaints and subsequent lawsuit. This is an infringement upon Snead's freedom of speech.

182. Defendants Parrish, Parks, and Croft not only acquiesced but also condoned Snead's treatment.

**4. Contributions to infringement on freedom of speech by the Libraries and mail rooms:**

183. Defendant Mohr has given orders that no staff members other than security are to be replaced when their positions open. This has caused the Libraries to operate poorly. The Library is the only place to find OACs, DRC policies and, but not limited to, individual institutional policies. Without these resources, a prisoner cannot grieve successfully. Therefore, this policy violates prisoners' freedom of speech.

184. On or about January 1st, 2012, all ODRC mail rooms changed staff from COs to workers who had been trained in previous positions. These workers were not trained for work in the mail rooms, which handle kites containing the grievance materials. It began to take up to 10 days to return or deliver the

kites. At various stages in the grievance process, a prisoner is required to respond within a few days.

Therefore, the tardiness in which prisoners receive the grievance materials violates their freedom of

speech.

**B. KEVIN D. DARRAH:**

185.  Kevin D. Darrah is a 41-year-old prisoner who has been incarcerated at Madison Correctional

Institution (MaCI) since on or about January 14th, 2011.

186.  Plaintiff Darrah suffers from, but not limited to, the following conditions and/or injuries:

A.  Palmo-Plantar Hyper-Keratoderma ("HPK"), a condition which manifests itself with, but not

limited to:

1.  Debilitating pain from large and deep fissures that form on the bottom of his feet. These *open

wounds* make Plaintiff Darrah considerably more susceptible to MRSA and common Staph infections.

187.  The only successful treatment for Plaintiff Darrah is a medication called Soriatane, which is

being refused him only due to its cost.

**1.  Chronological events of Plaintiff Darrah's medical claims:**

188.  Plaintiff Darrah had been prescribed Soriatane by the Dermatologist at FMC, and this

prescription was continued by the CMO/ALP at Lebanon Correctional Institution ("LeCI"). Darrah had

been successfully using this medication for 4 years. Upon arrival at MaCI, on or about January 14th, 2011,

the medication was discontinued without notice and without Darrah being examined by a Doctor.

189.  On April 7th, 2011, Defendant Weil submitted a request for the Soriatane to the CRB. It was

declined, and Defendant Krisher authorized the use of Methotrexate in its place. Methotrexate has

dangerous side effects for any person in Plaintiff Darrah's condition and environment: A. Methotrexate

weakens the immune system. B. Methotrexate does not heal the fissures on Plaintiff Darrah's feet, thus

allowing insidious infections to enter his feet and take hold. MRSA and Staph infections run rampant in

this environment.

190.  Plaintiff Darrah began taking Methotrexate on April 12th, 2011.

191.  On or about June 14th, 2011, Plaintiff Darrah met with Defendant Weil, who increased the dosage of Methotrexate. This medication still failed to have the desired effects of healing the fissures in Darrah's feet. In fact, his feet worsened with the medication. When he had *no medication whatsoever*, the fissures on his feet would heal after a month or two, and his feet would have no fissures for several weeks at a time before others would form. After Darrah had been taking the Methotrexate for several months, he noticed the fissures almost healing and then breaking open again. He had *no relief from the fissures on his calluses whatsoever* while taking the Methotrexate, which caused him constant pain and placed him in constant danger of MRSA and Staph infections.

192.  After 3 months with no signs of improvement, Darrah's wife called Defendant Eddy's office to request that Darrah be put back on Soriatane. On July 15th, 2011, Defendant Eddy refused the request.

193.  On or about July 28th, 2011, Plaintiff Darrah was seen by the Podiatrist at MaCI. At this time, the Podiatrist noted that there was substantial pain, HPK lesions, and multiple areas of severe HPK buildup.

194.  On September 27th, 2011, Darrah was again seen by Defendant Weil, and the dosage of Methotrexate was again increased without the desired effect of healing the lesions.

195.  On or about November 16th, 2011, Defendant Weil ascertained that Methotrexate was ineffective. He again filed a request to treat Darrah with Soriatane.

196.  This request was still met with resistance from Defendant Stanforth and CRB due to the cost of the medication.

197.  Darrah had now been without the proper medication, and thus in extreme pain and in danger of MRSA infection for almost a year.

198.  Desperate for her husband's relief, Darrah's wife offered to pay for the Soriatane and have it sent from the pharmacy to MaCI directly.

199.  Once cost was no longer an issue, Defendant Stanforth and CRB approved the medication.

200.  On or about November 18th, 2011, Defendant Weil sent a prescription for Soriatane for Darrah to an outside pharmacy.

201. On or about November 29th, 2011, the order of Soriatane was shipped from the pharmacy.

202. On or about December 28th, 2011, Defendant Wilson, the acting HCA, refused to give Darrah the Soriatane. Defendant Wilson claimed that the "proper procedures are not in place."

203. After much back-and-forth, Darrah finally began taking Soriatane on February 2nd, 2012.

204. Currently Plaintiff Darrah is being supplied Soriatane at his loved one's expense. It is purchased by his wife and sent to the Institution.

205. The Defendants have shown and continue to show deliberate indifference to Plaintiff Darrah's serious medical needs.

## XII.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

206. Plaintiff Snead filed an informal complaint regarding Defendant Stanley's conduct on December 2nd, 2010. Its final disposition by the Chief Inspector's office, dated, July 8th, 2011, is attached as Exhibit A.

207. Plaintiff Snead filed an informal complaint regarding the Defendants' failure to schedule surgery for the left inguinal hernia on March 23rd, 2011. Its final disposition by the Chief Inspector's office, dated June 2nd, 2011, is attached as Exhibit B.

208. Plaintiff Snead filed an informal complaint regarding improper transportation on June 24th, 2011. Its final disposition by the Chief Inspector's office, dated September 6th, 2011, is attached as Exhibit C.

209. Plaintiff Snead filed an informal complaint regarding the lack of post-surgical medical care on June 30th, 2011. Its final disposition by the Chief Inspector's office, dated September 3rd, 2011, is attached as Exhibit D.

210. Plaintiff Darrah filed an informal complaint regarding his medical care on July 7th, 2011. Its final disposition by the Chief Inspector's office, dated October 13th, 2011, is attached as Exhibit E.

211. Plaintiff Snead filed an informal complaint regarding library services on September 7th, 2011. Its final disposition by the Chief Inspector's office, dated March 22nd, 2012, is attached as Exhibit F.

212. Plaintiff Snead filed an informal complaint regarding the total lack of medical care on September 21st, 2011. Its final disposition by the Chief Inspector's office, dated November 16th, 2011, is attached as Exhibit G.

213. Plaintiff Snead filed an informal complaint regarding Defendant Weil's abuses, dated January 30th, 2012. Its final disposition by the Chief Inspector's office, dated April 2nd, 2012, is attached as Exhibit H.

214. As a direct result of the Defendants' deliberate indifference, the individual Plaintiffs have suffered, and continue to suffer, residual injuries, pain and suffering, emotional and physical distress, and a marked deterioration in their overall health.


### XIII.   FIRST CLAIM
### DENIAL OF ADEQUATE MEDICAL CARE

215. Plaintiffs incorporate Paragraphs 1 through 214 as though they were fully stated herein.

216. Defendants Mohr, Krisher, Croft, Desmarias, Hudson, Welch, Eddy, Stanforth, Parks, Weil, Johnson, Parrish, Wilson, Root, Roberts, Layne, and McGonigal violated the Plaintiffs' Eighth and Fourteenth Amendment Rights of the United States Constitution by the denial of adequate medical care and in the dissimilar treatment of similarly situated prisoners in the rendering of medical services and medications.

217. The Defendants have, under the color of State Law, deprived the Plaintiffs of rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments to the United States Constitution including, but not limited to, the right to be free from cruel and unusual punishment and the right the adequate medical care.


### XIV.   SECOND CLAIM
### DENIAL OF MEDICAL CARE

218. Plaintiffs incorporate Paragraphs 1 through 217 as though they were fully stated herein.

219. Defendants Mohr, Krisher, Croft, Desmarias, Hudson, Welch, Eddy, Stanforth, Parks, Weil, Johnson, Parrish, Wilson, Root, Roberts, and Layne violated the Plaintiffs' Eighth and Fourteenth Amendment rights of the United States Constitution in the complete denial of medical care.

220. The Defendants have, under the color of State Law, deprived the Plaintiffs of rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments to the United States Constitution including, but not limited to, the right to be free from cruel and unusual punishment and the right the adequate medical care.

## XV.    THIRD CLAIM
## DENIAL OF SAFE MEDICAL TRANSPORTATION

221. Plaintiffs incorporate Paragraphs 1 through 220 as though they were fully stated herein.

222. Defendants Mohr, Krisher, Croft, Desmarias, Hudson, Welch, Parks, Johnson, Parrish, and McGonigal violated the Plaintiffs' Eighth and Fourteenth Amendment rights of the United States Constitution in the unsafe transportation of prisoners seeking medical care at FMC (formerly CMC), OSU, or any other outside care facility and in the cruel and unusual punishment inflicted upon those prisoners while being held at FMC/CMC.

223. The Defendants have shown, and continue to show, a wanton and reckless disregard for prisoners' safety during medical transport and are deliberately indifferent to their basic need for safe medical transportation.

224. The Defendants have, under color of State Law, deprived the Plaintiffs of rights, privileges, and immunities secured by the Eighth and Forteenth Amendments to the United States Constitution including, but not limited to, the right to be free from cruel and unusual punishment and the right to adequate medical care.

## XVI.   FOURTH CLAIM
## INFRINGEMENTS UPON PRISONERS' RIGHT TO FREE SPEECH

225. Plaintiffs incorporate Paragraphs 1 through 224 as though they were fully stated herein.

226. Defendants Mohr, Croft, Stanforth, Parks, Weil, Johnson, Parrish, Roberts, Layne, and Stanley violated the Plaintiffs' right to freedom of speech as is secured by the First Amendment to the United States Constitution.

227. The Defendants have, under color of State Law, deprived the Plaintiffs of rights, privileges, and immunities secured by the First Amendment to the United States Constitution. The Defendants have acted to suppress and infringe upon prisoners' right to free speech in a systemic manner. The Defendants' actions were and are enough to stop a prisoner of ordinary firmness from exercising his right of free speech.

## XVII. DAMAGES

228. Plaintiffs demand Nominal, Compensatory, and Punitive damages, per Defendant and in an amount to be shown and determined at Trial.

## XVIII. PRAYER FOR RELIEF

Wherefore the Plaintiffs request that this Court:

A. Appoint Interim/Class Counsel;

B. Certify this action as a class action, after the appointment of Counsel;

C. Declare that the acts, inactions, or omissions, as are described herein, violated the rights of the Plaintiffs under the Constitution and laws of the United States of America;

D. Grant the relief requested in the preliminary injunction;

E. Award to the named Plaintiffs Nominal, Compensatory, and Punitive damages as are determined at Trial;

F. Award to the named Plaintiffs reimbursement for prescription and over-the-counter medication expenses;

G. Award members of the Plaintiff class reasonable Attorney fees and costs;

H. Grant other just and equitable relief that this Honorable Court deems necessary.

## XVIII.  VERIFICATION

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 10th day of August, 2012.


Robert A. Snead

Ma.C.I. WA-266-L
1851 State Route 56
P.O. Box 740
London, Ohio 43140

**Plaintiff In Pro Se**


Kevin D. Darrah

Ma.C.I. WA-134-U
1851 State Route 56
P.O. Box 740
London, Ohio 43140

**Plaintiff In Pro Se**

DRC4428

# Decision of the Chief Inspector on a Grievance Appeal

| Inmate: | | Institution: | |
|---|---|---|---|
| | DARRAH, KEVIN D | | MACI |
| **Number:** | A529840 | **Grievance No.:** | MACI-08-11-000052 |
| **Date:** | 10/13/2011 | | |

The office of the Chief Inspector is in receipt of your notification of grievance, the disposition of that grievance, and your appeal to this office. A review of your appeal has been completed. The decision of the Inspector is hereby

**Affirmed**

In your Notification of Grievance filed 8-4-11 you state you have received inadequate medical care by medical staff and have been denied medication. You state there has been no improvement with the medium dose of Methotrexate which was started approximately four months prior. You state it is not working. You add that you spoke to Dr. Weil a couple of months ago and the dosage was increased, and you claim there still is no improvement. You question why the medication (Soriatane) which you had been taking for four years was stopped when you arrived at MACI. You state it was prescribed by CMC dermatology clinic and kept your condition cleared up. You further state you are in severe pain because of this medical neglect and report you have open wounds on your feet. You further state the side effects from the Methotrexate (weakened immune system) puts you at an increased risk for staph infection. You are requesting the reinstatement of your prescription for Soriatane as a resolution to this grievance.

The investigation at your facility by the Institutional Inspector included review of your complaint. She also reviewed your medical file with assistance from Nurse Smith and HCA Stanforth. She also reviewed ODRC policy 68-MED-01. The Inspector found that on 6-14-11 you were seen by the Advanced Level Provider, Dr. Weil, and he did increase your dose of Methotrexate. On 7-28-11 you were seen by the podiatrist with complaint of severe calluses on both feet. You reported a history of palmo-plantar keratoderma and that you had been receiving Soriatane at your previous institution and it helped significantly. The podiatrist noted multiple areas of severe HPK buildup and there was a complaint of pain to palpation. Your feet were evaluated and it was determined there were HPK lesions. The podiatrist noted they would check on the possibility of a pumice stone for you to use on your feet. Prior to this, your medical file demonstrated medical staff did submit a "prior authorization" form to Bureau of Medical Services for Soriatane; however on 4-7-11 the form was returned and the request denied. An alternative medication was suggested, and this was Methotrexate. This is currently the course of treatment prescribed by the Advanced Level Provider and it is a related a drug related to Soriatane. You were told that medical care is being given to you in accordance with policy. You were told you may submit a HSR form to medical staff for further evaluation if you believe the increased dosage is having an impact on your condition. She noted she would follow up with the HCA and Nurse 2 to determine what actions are to be taken as to the recommendation of a pumice stone by the podiatrist. The rest of your grievance was denied.

In your Appeal to the Chief Inspector filed 9-12-11 you make the same complaint. You also include other issues that were not addressed in the original complaint, and thus, will not be addressed further in this response.

My investigation of your Appeal included review of the above information. I also reviewed the CMC MOSS database that provides the details of dates for any scheduled medical trips to CMC and OSU hospitals. It also provides the results of lab work or testing ordered by physicians and schedule for chronic care clinic appointments. In addition, I reviewed your electronic health records, copies of your medical file provided by the HCA at your facility and commissary records. I also reviewed the request for non-formulary medication (Soriatane), which was denied. But Dr. Krisher did authorize Methotrexate on 4-6-11 review. On 7-28-11 you saw the podiatrist related to the severe calluses on both feet. You saw the physician on 9-27-11 related to your foot complaint and Methotrexate was added to your foot treatment and the dose was increased. Dr. Eddy, ODRC Chief Medical Officer, has been copied this response for his review and information.

My response, after review of the above information, is that the medical staff at your facility is giving you the proper care within the ODRC guidelines. I encourage you to maintain close contact with staff to ensure that your current medical concerns are being addressed. No further action will be taken in regard to this appeal at this time.

## EXHIBIT E

| Signature: *Nina Parker* | Title: R.N., ASSISTANT CHIEF INSPECTOR (MEDICAL) |
|---|---|