## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **KEVIN D. DARRAH** | **:** | **Case No.   2:12-CV-899** |
| | **:** | |
| **Plaintiff,** | **:** | **Judge George C. Smith** |
| | **:** | **Magistrate Judge Norah King** |
| | **:** | |
| **v.** | **:** | |
| | **:** | **PLAINTIFF'S RESPONSE AND** |
| | **:** | **MEMORANDUM IN** |
| **GARY C. MOHR, et al.,** | **:** | **OPPOSITION TO** |
| | **:** | **DEFENDANT'S MOTION FOR** |
| | **:** | **SUMMARY JUDGMENT** |
| | **:** | |
| **Defendants.** | **:** | |

<u>**TABLE OF CONTENTS AND SUMMARY OF ARGUMENT**</u>

<u>**Page No.**</u>

I.     **INTRODUCTION**...............................................................................................1

II.    **STATEMENT OF FACTS**................................................................................2

    A. **From 2006 to January 2011, Mr. Darrah's Plantar Hyperkeratoderma Was Successfully Treated with Soriatane Based on the Recommendations of Specialists.**.......................................................................................................3

    B. **Without a Medical Evaluation, Mr. Darrah Was Denied Any Treatment for His Plantar Hyperkeratoderma for Three Months after his Transfer to Madison.**.............................................................................................................4

    C. **Methotrexate is a Toxic Immunosuppressant Primarily Prescribed to Treat Cancer.**............................................................................................................6

    D. **Mr. Darrah Consistently Stated That Methotrexate Was Ineffective, That He Was in Pain Due to Inadequate Treatment of His Plantar Hyperkeratoderma, and That He Feared Contracting an Infection or Disease.** ........................7

    E. **After More than a Year of Suffering, Defendants Allowed Mr. Darrah to Take Soriatane, but Only If Mr. Darrah Paid for the Medication.** .....................8

    F. **Dr. Bozian Reviewed Mr. Darrah's Medical History and Found Mr. Darrah's Treatment was Unreasonable.** ...................................................................10

III.   **LAW AND ARGUMENT**................................................................................11

    A. **The Legal Standards**.......................................................................................12

        1. **The Standard of Review on a Motion for Summary Judgment**..........12

On a motion for summary judgment a court considers whether there exists "a genuine issue as to any material fact" and whether "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, as the moving party, Defendants have the burden of showing an absence of *any* material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

        2. **The Legal Standard for an Eighth Amendment Medical Care Claim**13

In order to state a claim that prison officials acted with "deliberate indifference to serious medical needs" in violation of an Eighth Amendment right to adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), a prisoner must allege facts sufficient to satisfy both an objective and a subjective component, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

**B. Genuine Issues of Material Fact Regarding Defendants' Deliberate Indifference to Mr. Darrah's Serious Medical Condition Preclude the Granting of Summary Judgment.** ................................................................................ 14

    **1. Objective Component: Genuine issues of material fact exist as to whether Mr. Darrah's condition, plantar hyperkeratoderma, constituted an objectively serious condition.** ................................................................ 14

        *i. From January to April 2011, Defendants **denied** Mr. Darrah the treatment **prescribed** by doctors at Lebanon for his **objectively serious** medical condition* ............................................................................................ 15

        Mr. Darrah has shown that there are genuine issues of material fact regarding the objective requirement, because there is a dispute as to whether Mr. Darrah was denied any treatment for his HPK, a condition "diagnosed by a physician as mandating treatment." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). There is also a dispute as to whether Mr. Darrah experienced significant pain that served no penological purpose as a result of this denial of care. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

        *ii. From April 2011 to February 2012, Defendants prescribed Mr. Darrah a **detrimental** treatment, Methotrexate, which **aggravated** his condition and caused him **pain**.* ............................................................................ 17

        Mr. Darrah has shown that there are genuine issues of material fact regarding the objective requirement, because there is a dispute at to whether he experienced pain and a worsening of his condition due to Defendants' "delay in [providing adequate] medical treatment." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). There is also a dispute as to whether Defendants' "provided treatment [that] was not an adequate medical treatment of his condition or pain," but instead aggravated Mr. Darrah's condition. *Id.* at 591.

    **2. Subjective Component: Genuine issues of material fact exist as to whether Defendants' knowledge of Mr. Darrah's serious medical condition and denials of Soriatane satisfy the subjective state-of-mind requirement.** 21

        *i. Defendants were deliberately indifferent to Mr. Darrah's serious medical needs based on each of three independent standards* .......................... 22

        a. Defendants chose to prescribe Mr. Darrah Methotrexate instead of Soriatane even though Methotrexate was a less efficacious treatment, demonstrating deliberate indifference to his serious medical need. ............................................................................................ 22

        Mr. Darrah has shown that there are genuine issues of material fact as to whether Defendants knowingly chose "an easier and less efficacious treatment" for his condition. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). There is a dispute as to

whether Methotrexate was so ineffective it "amount[ed] to no treatment at all." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

    b.   Defendants denied Mr. Darrah Soriatane for non-medical reasons, which was a violation of his rights to individualized and adequate medical care .............................................................................................26

There is a genuine dispute of material fact as to whether Defendants denied Mr. Darrah adequate medical treatment for non-medical reasons, in violation of his right to adequate medical care. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). There is also a dispute as to whether Defendants made "ultimate treatment decision[s]. . . on a case-by-case basis," with due consideration given to Mr. Darrah's individual circumstances, needs, and history. *Delker v. Maas*, 843 F. Supp. 1390, 1399 (D. Or. 1994).

    c.   Defendants denied Mr. Darrah Soriatane, which was a treatment prescribed as part of a treatment plan, thereby demonstrating a deliberate indifference to Mr. Darrah's serious medical needs. ....................30

There is a genuine dispute of material fact as to whether Defendants violated Mr. Darrah's rights by knowingly interrupting his "prescribed plan of treatment."*Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). The Sixth Circuit has "long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

  ii.  *Defendants also ignored a substantial risk of harm from infection when they denied and then delayed the provision of Soriatane and instead prescribed Methotrexate to Mr. Darrah* .............................................................33

There is a genuine dispute of material fact as to whether Defendants ignored "a substantial risk" that Mr. Darrah could face "serious harm" from an infection while he was on Methotrexate. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Prison authorities may not be deliberately indifferent to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

**C. Defendants Violated a Clearly Established Constitutional Right and Should Not Be Granted Qualified Immunity.**................................................................35

Pursuant to the two prong test from *Roth v. Guzman*, 650 F.3d 603, 609 (Defendants' are not entitled to qualified immunity if they (1) violated Plaintiff's constitutionally protected right, and (2) that right was clearly established at the time of the violation.)

Defendants' are not entitled to qualified immunity because they violated a clearly established constitutional right.

**D. This Court Has Personal Jurisdiction over Defendant Stanforth.** ............37

**1. Ms. Stanforth waived her defenses of insufficient service of process and lack of personal jurisdiction.** ..........................................................................37

Ms. Stanforth has waived any defense of insufficient service of process or lack of jurisdiction because (1) she submitted to the jurisdiction of this Court at a conference with the Magistrate Judge (Scheduling Order, Doc. 20 at 1); (2) she failed to include either defense in her answer, Fed. R. Civ. P. 12(h); (3) she has waived these defenses through extensive participation in this litigation, *see King v. Taylor*, 694 F.3d 650, 658 (6th Cir. 2012); and (4) exercising personal jurisdiction over Ms. Stanforth would comport with Due Process.

**2. The State of Ohio, as legal representative for Ms. Stanforth, waived her defenses of insufficient service of process and lack of personal jurisdiction.** ............................................................................................39

The State's assertion that it can preserve Ms. Stanforth's defenses by representing her is not supported by statutory or legal authority.

**IV. CONCLUSION** ...................................................................................................40

iv

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN D. DARRAH** | : | **Case No.   2:12-CV-899** |
| | : | |
| **Plaintiff,** | : | **Judge George C. Smith** |
| | : | **Magistrate Judge Norah King** |
| | : | |
| **v.** | : | |
| | : | **PLAINTIFF'S RESPONSE AND** |
| | : | **MEMORANDUM IN** |
| **GARY C. MOHR, et al.,** | : | **OPPOSITION TO** |
| | : | **DEFENDANT'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| | : | |
| **Defendants.** | : | |

## I.    INTRODUCTION

For more than a year, Plaintiff Kevin Darrah, an inmate at Madison Correctional

Institution ("Madison"), endured excruciating pain from open wounds on his feet because

Defendants denied him adequate and effective treatment for his chronic condition, plantar

hyperkeratoderma ("HPK"). Mr. Darrah seeks (1) declaratory relief prohibiting defendants from

violating his constitutionally protected rights in the future and (2) damages for the expenses and

suffering he endured as a result of their actions.

Mr. Darrah filed a claim against Defendants under 42 U.S.C. § 1983, and Defendants

now move for summary judgment. Pursuant to Fed. R. Civ. P. 56, this Court should deny

Defendants' Motion for Summary Judgment ("Motion") on the issues of deliberate indifference

and qualified immunity because there are genuine issues of material fact in this matter.

Mr. Darrah was incarcerated at Lebanon Correctional Institution ("Lebanon") from 2006

to January 2011. While at Lebanon, dermatologists successfully treated Mr. Darrah's chronic,

inherited skin disease with Soriatane. Mr. Darrah was transferred to Madison in January 2011,

and his condition was untreated for three months. Mr. Darrah made numerous attempts to restart his Soriatane prescription, but his requests were denied. Eventually, Defendant Dr. Krisher ordered that Mr. Darrah be placed on Methotrexate, a toxic antimetabolite that reduces the body's ability to heal or fight infection. Mr. Darrah was on Methotrexate for the next ten months, during which time his condition worsened and he experienced severe pain. After over a year of unnecessary pain, Mr. Darrah was finally approved to take Soriatane, but only if Mr. Darrah's wife paid for the prescription. Mrs. Darrah paid for Soriatane through May 2013.  In June 2013, as a result of Mr. Darrah's lawsuit, Defendant Dr. Eddy finally allowed Mr. Darrah to be provided with Soriatane at the State's expense.

Defendants refusal to provide adequate medical care to Mr. Darrah for thirteen months, apparently for cost and administrative reasons, constituted deliberate indifference to his serious medical needs and violated his Eighth Amendment rights. Contrary to Defendants' assertions, there are genuine disputes as to the seriousness of Mr. Darrah's medical condition and the adequacy of his treatment. This Court should deny Defendants' Motion on the issues of deliberate indifference and qualified immunity because of these disputes of material fact.

## II.     STATEMENT OF FACTS

Plaintiff Kevin D. Darrah suffers from a chronic skin disease, HPK, which he was diagnosed with in 2005. (Cleveland Clinic Chart Note ("Clev. Clinic"), attached as Exhibit D at 1.) HPK is a chronic disorder that causes skin to thicken into calluses. (Expert Report of Dr. Richard Bozian ("Bozian Report"), attached as Exhibit B at 4.) These calluses can form lesions and deep, painful fissures,[1] which make it difficult to walk and may lead to infection. (*Id.* at 6.) "Without medication, these fissures develop at random and cause. . . significant pain." (Darrah

---

[1] "HPK causes skin to build up on my feet, creating thick calluses that crack and create painful open wounds ("fissures")." (Darrah Decl., Ex. A at ¶ 3.) These fissures are painful to walk on. (Bozian Report, Ex. B at 6.)

Declaration ("Darrah Decl."), attached as Exhibit A at ¶ 3.) As a chronic condition, HPK

requires long-term care. (Bozian Report, Ex. B at 6.)

   **A. From 2006 to January 2011, Mr. Darrah's Plantar Hyperkeratoderma Was Successfully Treated with Soriatane Based on the Recommendations of Specialists.**

   Mr. Darrah was incarcerated by the Ohio Department of Rehabilitation and Correction

("ODRC") in 2006. In December of 2006, Mr. Darrah was seen by physicians at Lebanon, who

referred him to a dermatologist for an evaluation of his feet. The physicians noted that Mr.

Darrah had been "successfully treated with Soriatane" and that "[m]ultiple other treatments [had

been] ineffective." (Dermatology Consult Requests ("Derm. Consults"), attached as Exhibit E at

1.) Within a week of this referral, Mr. Darrah was placed on Soriatane to treat his condition. (*Id.*)

The Soriatane prescription was a "carry medication"[2] for which Mr. Darrah would request refills.

(Darrah Decl., Ex. A at ¶ 6.) He was treated by dermatologists throughout his time at Lebanon

and consistently received Soriatane as part of his treatment. (Derm. Consult, Ex. E.)

   Soriatane was clearly effective in treating Mr. Darrah's HPK during the four years he

remained at Lebanon. On September 5, 2007, a Dermatology Consultation Request stated,

"currently on Soriatane with good results." (*Id.* at 2.) On December 19, 2007, his dermatologist

noted, "plantar keratoderma [is] much improved on Soriatane." (*Id.* at 4.) On June 18, 2008, a

Dermatology Consultation Request stated that his condition had "improved on Soriatane" and

---

[2] Prisoners keep "carry medications," with their belongings. These medications are not distributed at pill call and are therefore not included on the monthly Medication Administration Records ("MAR") filled out by medical staff. In his report, Defendants' expert Dr. Carlson incorrectly identified Neurontin as the only medication Mr. Darrah was prescribed as of December 2010, one month before Mr. Darrah was transferred to Madison. (Defs.' Mot. Summ. J., Doc. 40-3.) Dr. Carlson references Mr. Darrah's December 2010 MAR when he draws this conclusion about Mr. Darrah's medications. Mr. Darrah's transfer forms and his list of carry medications from Lebanon clearly indicate that he was prescribed Neruontin, which he picked up at pill call, as well as Sinemet and Soriatane, which were prescribed as carry medications. (Transfer and Intake Forms, attached as Exhibit F at 2; Carry Medications, attached as Exhibit H.) This is not the only error relied upon by Dr. Carlson. (*Compare*, Carlson report, Doc. 40-3 at 1 (claiming that earliest indication of HPK was on April 21, 2008) *with* Derm. Consults, Ex. E at 1 (HPK diagnosis and Soriatane prescription in December 2006).)

Mr. Darrah was "happy and satisfied with treatment." (*Id.* at 3.) On June 24, 2008, a Lebanon physician noted that the medication was "working for him." (Lebanon Medical Records ("LeCI Med. R."), attached as Exhibit L at 1.) On February 18, 2009, a Dermatology Consultation Request stated, "chronic congenital plantar keratoderma, stable and improved on Soriatane." (Derm Consults, Ex. E at 5.)  On April 15, 2009, a Dermatology Consultation Request stated, "Soriatane [has] made huge difference." (*Id.* at 6.)  Despite years of progress, the successful management of Mr. Darrah's HPK ended abruptly when Mr. Darrah was transferred to Madison.

### B. Without a Medical Evaluation, Mr. Darrah Was Denied Any Treatment for His Plantar Hyperkeratoderma for Three Months after his Transfer to Madison.

Mr. Darrah was transferred to Madison on January 18, 2011. (Transfer and Intake Forms ("Trans. and Intake"), attached as Exhibit F at 5.) That day, Defendant David Weil, the Chief Medical Officer, placed a telephone order for two of Mr. Darrah's medications, but not Soriatane.[3] (Medications January-April 2011 ("Meds. Jan-Apr 11"), attached as Exhibit J at 1.)

Between January 31 and March 2, 2011, Mr. Darrah made numerous appearances at Nursing Sick Call requesting his Soriatane.[4] (*Id.* at 1.) On March 2, 2011, Mr. Darrah was finally seen by a physician, Dr. Weil. During this visit, Dr. Weil observed that Mr. Darrah's feet were already beginning to fissure, and he was forced to walk on his toes. (*Id.* at 1, 2.) Dr. Weil also noted that Soriatane had previously been an effective treatment and that Mr. Darrah believed his

---

[3] Dr. Weil prescribed Sinemet and Neurontin, which treated Mr. Darrah's restless leg syndrome and permanent nerve damage, respectively. (Meds. Jan-Apr 2011, Ex. J at 1.) Sinemet and Soriatane were prescribed as "carry" meds at Lebanon, but only Sinemet was prescribed at Madison. (Carry Meds. Ex. H; Darrah Decl., Ex. A at ¶ 6.)

[4] ODRC policy 52-RCP-06 requires that, "A reception ALP (Advanced Level Provider) shall perform a physical examination on each inmate within 7 days of the inmate's arrival at the reception center" and document the exam on form DRC5033 (ODRC Policy 52-RCP-06, attached hereto as Exhibit Z at VI(B)(1); *see also*, 68-MED-01, Ex. AA.) A physician or advanced nurse should have examined Mr. Darrah within **one** week of his transfer. Form DRC5033 is not contained in Mr. Darrah's medical records, and there is no other documentation of Mr. Darrah being seen by a physician until March 2, 2011, nearly six weeks after his transfer to Madison. (IPN Jan-Apr 11, Ex. M at 2.)

prior authorization for the non-formulary medication was still in effect. (*Id.* at 2; IPN January-April 2011("IPN Jan-Apr 11"), attached as Exhibit M at 1, 2.)

Soriatane is not contained on ODRC's pre-approved list of drugs ("formulary"). (IPN Jan-Apr 11, Ex. M at 4.) Before prescribing a drug that is not on ODRC's formulary, a physician must submit a request to ODRC's Bureau of Medical Services. (ODRC Policy 68-MED-11 ("68-MED-01"), attached as Exhibit AA.) ODRC policy states that "verified non-formulary medication orders shall be continued and administered for 14 days," but Defendants failed to continue Soriatane upon Mr. Darrah's transfer to Madison. (ODRC Policy 52-RCP-06 ("52-RCP-06"), attached as Exhibit Z at IV(A)(5)(d).)

On March 19, 2011, Mr. Darrah filed an informal complaint stating that he was in "excruciating pain" due to his complete lack of treatment. (Informal Complaint Resolution March 2011 ("ICR Mar 11"), attached as Exhibit S.) In a kite[5] to Defendant Karen Stanforth, Healthcare Administrator at Madison, Mr. Darrah also explained that he was in "a great deal of danger for staph infection." (Kite to Stanforth ("Kite"), attached as Exhibit T.) On March 22, 2011, Mr. Darrah filed a skin complaint form stating that he was "not getting proper treatment for [his] feet." (Skin Complaint March 2011 ("Skin Compl. Mar 11"), attached as Exhibit X at 1.) On March 28, 2011, Dr. Weil placed Mr. Darrah on a 20-day medical lay-in because he was in severe pain from the large fissures that had developed on his feet. (*Id.* at 3; Darrah Decl., Ex. A at ¶ 10 ("I could barely walk because I was in so much pain from these fissures").)

On April 4, 2011, Dr. Weil requested the non-formulary medication Soriatane to treat Mr. Darrah's HPK by submitting a Request for Non-Formulary Drug Prior Authorization (PA) to the Bureau of Medical Services. (Prior Authorization Requests ("PA Req."), attached as Exhibit G at 1.) The PA stated that Mr. Darrah had "very hard, fissured" plaques on his heels that cause him

---

[5] A kite is a written communication from a prisoner to medical staff.

to "walk[] on his toes when without Soriatane." (*Id.*)  Dr. Weil further stated that steroid creams did not soften or penetrate Mr. Darrah's calluses, and that prednisone, a corticosteroid on the formulary, did not help. (*Id.*) On the same date this PA was sent in, Mr. Darrah's wife, Lacona Darrah, contacted Ms. Stanforth about Mr. Darrah's need for Soriatane. Ms. Stanforth's initial response was to ask Mrs. Darrah "to see if he has private insurance and if [the] plan would provide the Soriatane since [it was] not on [the] DRC formulary." (IPN Jan-Apr 11, Ex. M at 4.)

On April 6, 2011, Dr. Krisher, an employee of the Bureau of Medical Services at ODRC, denied the PA for Soriatane. (PA Req., Ex. G at 1.) Dr. Krisher ordered the formulary drug, Methotrexate, and also ordered that Dr. Weil continue Mr. Darrah on the steroid creams. (*Id.* at 1.) Dr. Krisher's reason for removing Mr. Darrah from Soriatane and instead prescribing Methotrexate was that, "medications on the ODRC formulary are used as a treatment option prior to ordering non-formulary medications." (Krisher Interrogatories ("Krisher Interrog."), attached as Exhibit AC at 1.)

### C. Methotrexate Is a Toxic Immunosuppressant Primarily Prescribed to Treat Cancer.

Methotrexate is a formulary antimetabolite, which is primarily used to treat cancer, but can also be prescribed in low doses to treat psoriasis. (Bozian Report, Ex. B at 7.) Methotrexate is a highly toxic drug that can cause potentially life-threatening side effects and "should only be used to treat cases of psoriasis that cannot be controlled by other medications." (*Id.* at 44.) When it is needed, it should only be prescribed after a biopsy or a consult with a dermatologist. (*Id.*) Unlike Soriatane, Methotrexate is an immunosuppressive medication that diminishes the body's ability to fight foreign substances, including bacterial infections and viruses. (*Id.* at 6.) "The immunosuppressive property of Methotrexate decreases cell growth and slows healing. . . ." (*Id.* at 7.) It is recommended that Methotrexate treatment plans have time periods with dose

6

reductions or off treatment because of the toxicity and immunosuppressant effects of the medication. (*Id.*) While Mr. Darrah was being prescribed Methotrexate his prescription was consistently increased over the ten months, never decreased. (IPN April 2011-March 2012 ("IPN Apr 11-Mar 12"), attached as Exhibit N; Medications June-November 2011 ("Meds. June-Nov 11"), attached as Exhibit K.)

### D. Mr. Darrah Consistently Stated That Methotrexate Was Ineffective, That He Was in Pain Due to Inadequate Treatment of His Plantar Hyperkeratoderma, and That He Feared Contracting an Infection or Disease.

Mr. Darrah and his wife made a number of complaints regarding his treatment in the ten months he was on Methotrexate. In April of 2011, Mr. Darrah's cellmate was diagnosed with tuberculosis while Mr. Darrah was on Methotrexate. Because of the immunosuppressive properties of Methotrexate, Mrs. Darrah expressed concerns that her husband was at significant risk of contracting an infectious disease. (Declaration of Lacona Darrah ("Lacona Decl."), attached as Exhibit C at 1.) On June 14, 2011, Mr. Darrah reported to Dr. Weil that his feet were, "no worse but no better." (IPN Apr 11-Mar 12, E. N at 3.) On July 5, 2011, Mrs. Darrah sent two emails to Ms. Stanforth about Mr. Darrah's pain and risk of infection. (Lacona Decl., Ex. C at 3, 4.) An inmate in the cell next to Mr. Darrah was admitted to the hospital with a staph infection. (*Id.*) At this time, Mr. Darrah had been on Methotrexate for three months, had three fissures on his feet, and was in "excruciating pain." (*Id.*) Mrs. Darrah again expressed concerns about Mr. Darrah's risk of contracting a staph infection. (*Id.*) Ms. Stanforth was aware of his condition. In an email to other ODRC staff, Ms. Stanforth noted that Mrs. Darrah had sent pictures of Mr. Darrah's feet from "when he was on the more expensive drug," i.e. Soriatane. (Stanforth Interrogatories ("Stanforth Interrog."), attached as Exhibit AD at 5.)

On July 7, 2011, Mr. Darrah filed an informal complaint stating he was "in constant, severe pain." (Informal Complaint Resolution July 2011 ("ICR July 11"), attached as Exhibit U.)

A week later, Dr. Andrew Eddy, State Medical Director at ODRC, denied Mrs. Darrah's request for her husband to start Soriatane again, deciding to "continue with the current treatment plan at this time, which is Methotrexate." (Lacona Decl., Ex. C at 11.) On July 28, 2011, the podiatrist noted that Mr. Darrah was experiencing "severe HPK buildup with pain to palpation." (IPN Apr 11-Mar 12, Ex. N at 4.) On September 17, 2011, Mr. Darrah filed a Skin Complaint form explaining that he had "no relief." (Skin Complaint September 2011 ("Skin Compl. Sept. 11"), attached as Exhibit Y at 1, 2.) On November 1, 2011, Dr. Weil prescribed "Elavil for pain for [the] time being," and noted "no improved benefit with [Methotrexate], heel fissure not closing like usual." (CDC Baseline Medical Data ("CDC Med. Data"), attached as Exhibit P at 1-4.) Mrs. Darrah emailed Ms. Stanforth again explaining that her husband had "no respite from pain at all." (Lacona Decl., Ex. C at 5.)

Though Mr. Darrah made a good-faith effort to try Methotrexate, the medication was not effective and left Mr. Darrah in constant pain. (CDC Med. Data, Ex. P at 1-4; Darrah Decl., Ex. A at ¶ 11 ("I was in severe pain due to these open fissures for the entire period that I was prescribed [Methotrexate]. I regularly informed Defendants of my pain and that [Methotrexate] was not treating my HPK").) While taking Methotrexate, Mr. Darrah experienced numbness and swelling of his arm, which Dr. Weil recognized as possible side effects of the Methotrexate. (IPN Apr 11-Mar 12, Ex. N at 1.)  Instead of using the information from Mr. Darrah to treat his individual symptoms, Dr. Weil increased the dosage of Methotrexate and continued to prescribe it for a total of ten months. (IPN Apr 11-Mar 12, Ex. N; Meds. June-Nov 11, Ex. K.)

### E.  After More than a Year of Suffering, Defendants Allowed Mr. Darrah to Take Soriatane, but Only If Mr. Darrah Paid for the Medication.

After enduring months of suffering and risk of infection, Mr. Darrah was given the opportunity to take Soriatane, but only if he or his wife could pay for the prescription. (IPN Apr

11-Mar 12, Ex. N at 4, 5.) On November 17, 2011, Dr. Weil informed Mr. Darrah that he would write a prescription that Mr. Darrah could pay to fill outside the prison. (*Id.* at 4.) However, Mr. Darrah did not start taking Soriatane for another three months. (MAR February 2012 ("MAR Feb 12"), attached as Exhibit I at 1.) Mrs. Darrah ordered the prescription from a Canadian pharmacy because it was less expensive. (Lacona Decl., Ex. C at 3.) On November 18, 2011, Dr. Weil sent the prescription for Soriatane to a pharmacy in Canada that would then be shipped to Madison, but Mr. Darrah did not receive the prescription immediately because of a problem with the medication coming into Madison. (IPN Apr 11-Mar 12, Ex. N at 5, 6.) On January 26, 2012, Dr. Weil sent a PA Request to allow Mr. Darrah to receive the non-formulary medication that his wife purchased. (PA Requests, Ex. G at 2 (noting "paid for by pt's wife").) Dr. Eddy, signed the PA request—approving the prescription for 90 days. (*Id.*) Mr. Darrah finally began receiving Soriatane in February 2012. (IPN Apr 11-Mar 12, Ex. N at 5.)

Even after Mr. Darrah showed improvement on Soriatane, Defendants continued to refuse to prescribe him Soriatane through the prison pharmacy, requiring his wife to pay for this treatment for the next 15 months. On March 12, 2012, Mr. Darrah's podiatrist noted a "history of severe callouses (sic) and fissuring. Inmate states he's been taking Soriatane for 1 month and [his] feet are improving." (IPN Apr 11-Mar 12, Ex. N at 7.) On March 21, 2012, a nurse asked Mrs. Darrah to place a new order, stating that the Soriatane was helping. (*Id.*) On April 23, 2012, Mr. Darrah had a Chronic Disease Clinic Follow-Up and it was noted that his feet were improving with "[j]ust some scaly flakes remain[ing]." (CDC Follow-up April 2012 ("CDC Follow-up Apr 12"), attached as Exhibit R; *see also* IPN April-November 2012, attached as Exhibit O (noting continued improvement).)

Throughout 2012, Dr. Eddy approved Soriatane for Mr. Darrah. Each of the requests noted that Mrs. Darrah was paying for the medicine. (PA Requests, Ex. G at 3 (noting "Inmate's wife pays for the medicine"); *id.* at 4 ("180 day supply ordered/obtained from Canadian pharmacy. . . and paid for by patient's wife").)  Mrs. Darrah continued to pay for Mr. Darrah's Soriatane through May 2013, when the last order she placed ran out. (Darrah Interrogatories ("Darrah Interrog."), attached as Exhibit AB at 11-24.) On June 13, 2013, a physician from Madison sent a PA Request that stated, "This has already been approved for his wife to pay for it. There has been legal action and now the DRC is to pay for it. Trevor Clark Esq [an ODRC attorney] and Dr. Eddy are involved." (PA Requests, Ex. G at 6.) Dr. Eddy signed this request and approved Mr. Darrah to be provided with Soriatane for one year. (*Id.*)

F.  **Dr. Bozian Reviewed Mr. Darrah's Medical History and Found That Mr. Darrah's Treatment was Unreasonable.**

Dr. Richard Bozian, a physician and Professor Emeritus of Medicine at University of Cincinnati College of Medicine, reviewed documents related to this case and formed a medical opinion, to a reasonable degree of medical certainty, concerning the care Mr. Darrah received while at Madison. He found that there was "no medical basis stated for discontinuing the prescription" for Soriatane in January 2011. (Bozian Report, Ex. B at 7.) He also found that Methotrexate—a toxic drug only appropriate for short term treatment—was not suitable for Mr. Darrah's inherited condition because he will need treatment for the rest of his life.  (*Id.* at 8.)

Dr. Bozian noted that Mr. Darrah was only not being improperly treated and in pain, but he was also at an increased risk of contracting an infectious disease because of the open wounds on his feet. (*Id.* at 9.) In recent years, studies have shown an increased incidence of antibiotic-resistant staph infections in prison populations throughout the United States. (*Id.* at 7, *discussing* Bianca Malcolm, *The Rise of Methicillin-Resistant* Staphylococcus Aureus *in US Correctional*

*Populations*, 17 J. Corr. Health Care 254 (2011).) Dr. Bozian concluded that placing Mr. Darrah on Methotrexate in these conditions, while he was exposed to these infectious diseases, was a substantial risk to Mr. Darrah's health. (*Id.* at 10.)

Dr. Bozian states, "Mr. Darrah was not recommended to switch medications by a dermatologist. It is inappropriate for a primary physician or medical administrator to discontinue treatment and make such a change without recommendation from a dermatologist." (*Id.* at 10.) Finally, Dr. Bozian concluded, "This delay in providing effective medication to treat Mr. Darrah's condition, which presented itself as severe HPK buildup and painful fissures, was unreasonable and a substantial departure from the standard of care." (*Id.* at 10.)

## III.    LAW AND ARGUMENT

Defendants denied Mr. Darrah Soriatane, a medication they knew effectively treated his painful condition, for financial and administrative reasons that had nothing to do with his medical history or adequate medical care. Although Mr. Darrah had received Soriatane from dermatologists at his previous institution, Defendants abruptly stopped providing him this prescribed treatment for three months, at which point Defendants prescribed him Mexotrexate, a less expensive treatment that made his symptoms worse, kept him in pain, and exposed him to risk of infection. After ten months of suffering and complaints by Mr. Darrah, Defendants approved Soriatane, but only after he and his wife had ordered and paid for the medication themselves. Defendants only agreed to provide Mr. Darrah Soriatane at the State's expense after he filed suit and had paid for fifteen months of his own treatment.

Defendants bring this motion arguing that they are entitled to summary judgment as a matter of law, alleging that the undisputed facts fail to satisfy a deliberate indifference claim and

that Defendants are entitled to qualified immunity.[6] Because there are genuine issues of material fact, Defendants' motion for summary judgment should be denied. Additionally, in light of the factual issues in dispute and because the legal basis for Mr. Darrah's Eighth Amendment claim was clearly established at the time of Defendants' conduct, Defendants are not entitled to qualified immunity.

## A. The Legal Standards

### 1. The Standard of Review on a Motion for Summary Judgment

On a motion for summary judgment, a court considers whether there exists "a genuine issue as to any material fact" and whether "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, as the moving party, Defendants have the burden of showing an absence of *any* material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Defendants must show that the evidence "is so one-sided that [they] *must* prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (emphasis added). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 247.

Summary judgment "must only be used with extreme caution for it operates to deny a litigant his day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). All inferences to be drawn from materials and facts must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), with the court "assum[ing] the non-movant's version of events," *Cordell*, 13-4203, 2014 WL 3455556, at *12; *see also Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

---

[6] Defendants also raise an issue about personal jurisdiction with respect to Defendant Stanforth. We will address this issue last.

In considering a motion for summary judgment, the court is "obligated to consider not only the materials specifically offered in support of the motion, but also all pleadings, depositions, answers to interrogatories, and admissions properly on file and thus properly before [the] court." *Id.* (internal quotation marks omitted). However, "[c]redibility determinations [of witnesses], the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Anderson*, 477 U.S. at 255. Even if a non-movant has only his own testimony to support his claims, the court may not dismiss this testimony where it is not directly contradicted by other evidence. *See Cordell v. McKinney*, 13-4203, 2014 WL 3455556, at *11 (6th Cir. July 16, 2014).

### 2. The Legal Standard for an Eighth Amendment Medical Care Claim

In order to state a claim that prison officials acted with "deliberate indifference to serious medical needs" in violation of an Eighth Amendment right to adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), a prisoner must allege facts sufficient to satisfy both an objective and a subjective component, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, Plaintiff must show that he had an objectively "sufficiently serious" medical need. *Id.* at 847. A condition "that has been diagnosed by a physician as mandating treatment or. . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" satisfies this component. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

Second, Plaintiff must show that Defendants "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm," *Farmer*, 511 U.S. at 846, by either denying or delaying adequate medical care, resulting in "any concomitant pain, suffering, or mental anguish," *Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991) (quoting *Parrish v. Johnson*, 800 F.2d 600, 611

13

(6th Cir. 1986)). Defendants are deliberately indifferent if they deny "reasonable requests for medical treatment," *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) or base decisions about medical care on non-medical considerations, such as "the inmate's ability or willingness to pay," *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

   **B.  Genuine Issues of Material Fact Regarding Defendants' Deliberate Indifference to Mr. Darrah's Serious Medical Condition Preclude the Granting of Summary Judgment.**

       In this case, there are genuine issues of material fact in dispute for both the objective and subjective components. First, there is a dispute as to whether Mr. Darrah's HPK, including his pain and risk of infection, is an objectively serious medical condition. Second, there is a dispute as to whether each Defendant had the necessary knowledge to be found deliberately indifferent in providing adequate medical care to treat Mr. Darrah's painful medical condition. When presented in their totality and construed in the light most favorable to Mr. Darrah, *see Matsushita*, 475 U.S. at 587, the facts of this case, at a minimum, present a genuine dispute as to whether each of the Defendants ignored a substantial risk of serious harm to Mr. Darrah. Therefore, this case should go to a jury to resolve the disputed facts.

       **1.  Objective Component: Genuine issues of material fact exist as to whether Mr. Darrah's condition, plantar hyperkeratoderma, constituted an objectively serious condition.**

       There are genuine issues of material fact as to whether Mr. Darrah's HPK condition and his concomitant pain were sufficiently serious to satisfy the objective component of the Eighth Amendment standard for deliberate indifference. The Sixth Circuit has stated that different standards apply where a plaintiff alleges a <u>denial</u> of care as opposed to a delay of <u>adequate</u> treatment. *Santiago*, 734 F.3d at 590. In this case, Mr. Darrah alleges that Defendants <u>denied</u> him any treatment for his serious medical condition for three months, from January to April 2011,

and then "treated" him with a toxic, immunosuppressive drug that worsened his condition for

another ten months thereafter, until February 2012.

> i. *From January to April 2011, Defendants **denied** Mr. Darrah the treatment prescribed by doctors at Lebanon for his **objectively serious** medical condition.*

Mr. Darrah has met the objective requirement of his deliberate indifference claim because

he has shown that he was denied any treatment for his HPK, which was "diagnosed by a

physician as mandating treatment." *Santiago*, 734 F.3d at 590. Mr. Darrah entered Madison with

a diagnosed condition and a prescription for Soriatane, which had been recommended by

specialists. Because an "interruption of a prescribed plan of treatment could constitute a

constitutional violation," Defendants' abrupt denial of treatment for Mr. Darrah's diagnosed

condition upon his arrival at Madison constitutes an act of deliberate indifference to a serious

medical need. *Santiago*, 734 F.3d at 589 (quoting *Estelle*, 429 U.S. at 97). Furthermore, Mr.

Darrah experienced pain as a result of this denial of care. *Estelle*, 429 U.S. at 103; *see Scott v.*

*Ambani*, 577 F.3d 642, 648 (6th Cir. 2009) (concluding that Plaintiff stated a claim for deliberate

indifference and his "serious medical needs" included "severe back and leg pain"); *Ralston v.*

*McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)  (the court reversed grant of summary judgment

to prison guard who failed to provide pain medication to inmate); *McElligott v. Foley*, 182 F.3d

1248, 1257 (11th Cir. 1999)  ("[P]rison officials may violate the Eighth Amendment's

commands by failing to treat an inmate's pain"); *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir.

1997)  (finding that "substantial back pain" was a serious medical need).

While in ODRC custody, Mr. Darrah was diagnosed with HPK by dermatology

specialists in 2006, as was recorded in his institutional medical records. (LeCI Med. R., Ex. L at

2.) HPK causes callus build-up on the pressure points of a patient's feet, which can then crack

and cause significant pain if the patient tries to perform normal daily activities, like walking.

(Bozian Report, Ex. B at 6; Darrah Decl., Ex. A at 1.) Defendants do not dispute that Mr. Darrah had been diagnosed with HPK or had been prescribed Soriatane by dermatologists while he was incarcerated at Lebanon. Defendants do not dispute that HPK is a serious condition that can cause pain,[7] but they do claim that they "immediately" addressed Mr. Darrah's complaints and that he only complained of pain on one occasion.

Mr. Darrah did not receive any treatment for three months, and this lack of care caused him significant pain. Despite the improvements to his condition from five years of treatment with Soriatane at Lebanon, which had "made [a] huge difference," (Derm. Consults, Ex. E at 6) Mr. Darrah's condition quickly degraded once he was transferred to Madison. *Phillips v. Michigan Department of Corrections*, 731 F. Supp. 792, 800 (E.D. Mich. 1990) ("[t]aking measures which actually reverse the effects of years of healing medical treatment [makes] the cruel and unusual determination much easier."). Even though Mr. Darrah's transfer forms indicated that he was prescribed Soriatane at the time of his transfer, Mr. Darrah did not receive any medication of any form for his HPK for three months. (Trans. and Intake, Ex. F; Meds Jan-Apr 11, Ex. J; Darrah Decl., Ex. A at ¶ 9.) Defendants claim that Mr. Darrah failed to report that he was in pain prior to March 22, 2011. (Defs.' Mot. Summ. J., Doc. 40 at 4.) However, Mr. Darrah went to Nursing Sick Call ("NSC") of his own accord on at least two occasions—January 31 and February 17— requesting Soriatane for his feet, which were getting worse and causing him pain. (IPN Jan-Apr 11, Ex. M at 1; Darrah Decl., Ex. C at ¶ 9.) On March 2, Dr. Weil noted that Mr. Darrah had open fissures on his feet and that he was walking on his toes without his prescription because he was in pain. (IPN Jan-Apr 2011, Ex. M at 1, 2; Darrah Decl., Ex. A at ¶ 9.) On March 19, Mr. Darrah submitted an informal complaint and a kite to Ms. Stanforth, stating that he was in

---

[7] Defendants' expert cites a paper that characterizes HPK as "a chronic condition, causing great discomfort and disability." (Defs.' Mot. Summ. J., Doc. 40 at Exhibit J.)

"excruciating pain" from "open wounds" on his feet. (ICR Mar 11, Ex S; Kite, Ex. T.) On March 28, Mr. Darrah reported that he wasn't getting treatment for his feet, and Dr. Weil placed him on medical restriction (patient lay-in) for 20 days due to his severe pain. (Skin Compl. Mar 11, Ex. X at 3; Darrah Decl., Ex. A at ¶ 10.) On April 4, 2011, after three months at Madison without any treatment for his HPK, Mr. Darrah reported to Ms. Stanforth that "his calloues (sic) [were] growing thicker and starting to crack with fissures." (IPN Jan-Apr 11, Ex. M at 3, 4.)

Contrary to this evidence that Mr. Darrah's diagnosed medical condition was serious and caused him great pain for the three months where he received absolutely no treatment, Defendants claim that Mr. Darrah's needs were "immediately addressed" and that he only complained of pain for the first time on March 22, 2011. (Defs.' Mot. Summ. J., Doc. 40 at 6.) Thus, there are disputes of material fact as to whether Mr. Darrah had a serious medical condition and whether he experienced pain as a result of Defendants' denial of care for his serious medical condition.

> ii. *From April 2011 to February 2012, Defendants prescribed Mr. Darrah a **detrimental** treatment, Methotrexate, which **aggravated** his condition and caused him **pain**.*

An inmate can meet the objective requirement for deliberate indifference by demonstrating that treatment was inadequate where medical evidence "establish[es] the detrimental effect of the delay in medical treatment" and that "the provided treatment was not an adequate medical treatment of his condition or pain." *Santiago*, 734 F.3d at 590–91 (emphasis added). Defendants dispute that Mr. Darrah's "medical concerns rose to a serious medical condition," claiming that Methotrexate "at a minimum[] maintained his calloues (sic) in a pain-free, stable condition." (Defs.' Mot. Summ. J., Doc. 40 at 10.) The record, however, indicates that Methotrexate actually worsened Mr. Darrah's HPK, causing him pain.

Methotrexate did not treat Mr. Darrah's condition or improve his symptoms, which caused him significant pain. On April 7, Defendants prescribed Methotrexate despite Mr. Darrah's repeated reports that he had been on Soriatane for years and that no other medication worked. (*See, e.g.*, ICR Mar 11, Ex. S ("Soriatane is the only med that keeps this under control").) The decision not to approve Soriatane was in direct contradiction with the treatment plan developed by dermatologists. (Derm. Consults, Exhibit E at 1-6.) In June 2011, two months after starting Methotrexate, Mr. Darrah reported to Dr. Weil that the medication made his condition no worse but no better, (IPN Apr 11-Mar 12, Ex. N at 3.) which meant that his feet were maintained in a continuously cracked state. In response, Dr. Weil increased the dosage of Methotrexate, ignoring his past suspicions of side effects and the toxic nature of Methotrexate. (Meds. June-Nov 11, Ex. K at 2; IPN Apr 11-Mar 12, Ex. N at 1; Bozian Report, Ex. B.) On July 5, Mrs. Darrah emailed Ms. Stanforth stating, "Kevin has been on methotrexate for almost 3 months now and has seen *very little improvement*. He now has 3 very large splits on his feet. . . [and] he is in *excruciating pain*. . . ." (Lacona Decl., Ex. C at 4 (emphasis added).) Two days later, Mr. Darrah sent an informal complaint to Ms. Stanforth stating he was in constant, severe pain from fissures forming on his feet, and that he had been trying to get back on Soriatane since January. (ICR  July 11, Ex. U.) That month, Ms. Stanforth instructed an ODRC staff member to take photos[8] of Mr. Darrah's feet, which show fissures on Mr. Darrah's feet that caused him pain. (Stanforth Interrog., Exhibit AD at 5; Darrah Decl., Ex. C at 6.) On numerous occasions over the next few months, Mr. Darrah and his wife reported that Methotrexate was not working and that he was in "severe pain, no matter what I do."  (NOG July 11, Ex. V; IPN Apr 11-Mar 12, Ex. N at 4; Skin Compl. Sept. 11, Ex Y; CDC Follow-Up September 11 ("CDC Sept. 11"),

---

[8] Defendants only supplied printed black and white copies of these photos. Plaintiff will file a supplemental memorandum with color photographs when they become available from Defendants.

attached as Exhibit Q; Lacona Decl., Ex. C at 4.) Dr. Weil responded by increasing his dose of Methotrexate again. (Meds. June-Nov 11, Ex. K at 1.) These records indicated that Methotrexate was not effective in treating Mr. Darrah's HPK and that he suffered pain every day Defendants prescribed him Methotrexate and refused him Soriatane.

Mr. Darrah's condition actually **deteriorated** while he was on Methotrexate to the point where his feet were worse than when he received no treatment at all. (Darrah Decl., Ex. A at ¶ 11.) On November 1, Dr. Weil noted that Mr. Darrah had "no improved benefit with Methotrexate" and that his "heel fissures [were] not closing like usual." (CDC Med. Data, Ex. P at 1 (emphasis added).) That same day, Mrs. Darrah emailed Ms. Stanforth again, stating that Methotrexate was not treating Mr. Darrah's condition, that "his feet are worse," and that "his pain is indeed much worse." (Lacona Decl., Ex. C at 13.) Mr. Darrah confirms his wife's account that, under Methotrexate, his wounds would begin to heal but then would split open, giving him no respite from pain. (Darrah Decl., Ex. A at ¶ 11.) This was worse than when Mr. Darrah was without any medication at all: without medication, his feet heal in between fissures. (*Id.* at ¶ 3.) Contrary to these numerous reports of Mr. Darrah's worsening condition and pain while on Methotrexate, Defendants claim that the record indicates Mr. Darrah's condition was "stable" (Defs.' Mot. Summ. J., Doc. 40 at 5, 10). Even if this characterization were accurate—which is contested by the aforementioned medical records—maintaining a patient in a "stable" state of pain with open wounds is still an unreasonable and substantial departure from the standard of care. (Bozian Report, Ex. B at 10.)

Methotrexate prevented Mr. Darrah's symptoms from improving and also placed him at an increased risk of serious harm from infection. Methotrexate is a toxic drug that suppresses the immune system and slows healing. (Bozian Report, Ex. B at 7-8.) Conversely, Soriatane does not

compromise the immune system or slow the healing process, so Mr. Darrah would have been at a higher risk of contracting an infection while Defendants prescribed him Methotrexate instead of Soriatane. (*Id.* at 6-9.) Mr. Darrah was prescribed Methotrexate while he was still on a patient-lay in due to the severe fissures on his feet. (Skin Compl. Mar 11, Ex. X; Darrah Decl., Ex. A at ¶ 10.) Prescribing Methotrexate reduced his body's ability to heal these open sores, which remained open wounds for the entire ten months he was prescribed Methotrexate and caused him extreme pain. (Darrah Decl., Ex. A at ¶ 11.) Methotrexate's function as an antimetabolite (slowing cell growth) actually *worsened* Mr. Darrah's condition: without any treatment for HPK, Mr. Darrah's fissures would eventually heal on their own. (*Id.* at ¶ 3.) On Methotrexate, however, Mr. Darrah was consistently walking on open wounds.

Furthermore, there is objective evidence that Mr. Darrah was at risk of contracting an infection at Madison. While Mr. Darrah was prescribed Methotrexate, he was housed with a cell mate who had been diagnosed with tuberculosis and had stopped taking his medication. (Lacona Decl., Ex. C at 3.) Another inmate on Mr. Darrah's cell block was diagnosed with an infection from the bacteria *Staphylococcus aureus* ("staph"). (Lacona Decl., Ex. C at 4.) In July 2011, after Mr. Darrah had been on Methotrexate for several months, an inmate on his cell block contracted an infection and had his foot amputated. (Notification of Grievance July 2011("NOG July 11"), attached as Exhibit V.) In a recent study, researchers found that prisons in the United States have seen a resurgence of methicillin-resistant *Staphylococcus aureus* ("MRSA"), which is a potentially fatal strain of staph. (Bozian Report, Exhibit B at 20.) Open wounds and a depressed immune system—a side effect of Methotrexate—would increase Mr. Darrah's risk of contracting *any* infection, including staph. (*Id.* at 9.)

Mr. Darrah finally received Soriatane on February 3, 2012, over a year after he was transferred to Madison. (MAR Feb 12, Exhibit I at 1.) For ten months, Mr. Darrah was in serious pain due to the ineffective and detrimental treatment of Defendants, and he was also at a serious risk of contracting an infection. Defendants dispute these factual assertions, claiming they "maintained his keratoderma [HPK] in a stable condition, immediately addressing his concerns and requests." (Defs.' Mot. Summ. J., Doc. 40 at 10.) Thus, the issue of whether Mr. Darrah had an objectively and sufficiently serious medical condition should be determined by a jury.

> **2. Subjective Component; Genuine issues of material fact exist as to whether Defendants' knowledge of Mr. Darrah's serious medical condition and denials of Soriatane satisfy the subjective state-of-mind requirement.**

Under the subjective component of a deliberate indifference claim, the inmate must show that each defendant "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm" to the inmate. *Farmer*, 511 U.S. at 846. At the summary judgment stage, however, the burden lies with the moving party: Defendants must show that there are no genuine issues of material fact relating to each of the Defendant's state of mind with regards to Mr. Darrah's medical treatment or lack thereof. "Where knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care, the deliberate indifference standard has been met." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (internal quotation marks and citations omitted) (alteration in original). Furthermore, courts can "infer from circumstantial evidence that a prison official had the requisite knowledge." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Even if a plaintiff cannot show knowledge on the part of the defendant, "a prison official may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly expected to exist." *Id.* (internal quotation marks omitted); *accord Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991)

(finding that a nurse's failure to call another jail to confirm a prisoner's pain medication order was within her duty and authority).

Defendants claim that there is only a question of whether the care provided to Mr. Darrah was his "preferred" method, which is not a constitutional question. (Defs.' Mot. Summ. J., Doc. 40 at 9.) However, the facts indicate that Mr. Darrah was in severe pain from his chronic condition as a direct result of Defendants' knowing refusal (1) to provide any medical care for his first three months at Madison and (2) to provide adequate medical care for the ten months thereafter. Furthermore, the record indicates that Defendants prescribed Methotrexate instead of Soriatane due not to medical judgment, as claimed in their motion, but instead due to financial considerations without considering Mr. Darrah's individual medical history. The court should therefore deny the motion for summary judgment because there are material facts in dispute as to whether Defendants' initial denial of medical care and subsequent provision of detrimental medical care constituted a violation of Mr. Darrah's constitutional rights.

     i.   *Defendants were deliberately indifferent to Mr. Darrah's serious medical needs based on each of three independent standards.*

        a.   Defendants chose to prescribe Mr. Darrah Methotrexate instead of Soriatane even though Methotrexate was a less efficacious treatment, demonstrating deliberate indifference to his serious medical needs.

Defendants were deliberately indifferent to Mr. Darrah's serious medical condition because they chose Methotrexate, which was "an easier and less efficacious treatment." *Monmouth Cnty.*, 834 F.2d at 347; *see also Estelle*, 429 U.S. at 104 n.10 (quoting *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974)). Methotrexate was less efficacious in treating Mr. Darrah's condition than Soriatane, *see supra* Section III.B.1.ii, yet Defendants continued to prescribe Methotrexate for *at least* six months after it became evident that Methotrexate was so ineffective it "amount[ed] to no treatment at all." *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700,

704 (11th Cir. 1985). Defendants dispute these facts, claiming that Mr. Darrah was treated immediately and adequately, such that his condition remained "pain-free, stable." (Defs.' Mot. Summ. J., Doc. 40 at 10.)

Defendants knew that Soriatane was historically very efficacious in treating Mr. Darrah's HPK. In March 2011, Dr. Weil noted twice that Mr. Darrah had been prescribed Soriatane in the past with success and that no other medications worked. (IPN Jan-Apr 11, Exhibit M at 1, 2.) Ms. Stanforth was also made aware of this fact during March 2011, when Mr. Darrah submitted an Informal Complaint stating "Soriatane is the only med that keeps this [condition] under control." (ICR March 11, Exhibit S.) On April 4, 2011, Dr. Weil submitted a request for Soriatane to Dr. Krisher, again noting that Soriatane had been historically effective where other formulary medications, including steroid creams, had not. (PA Req., Exhibit G at 1.) In response to this request, Dr. Krisher knowingly denied Mr. Darrah access to Soriatane in favor of less efficacious treatments:  Dr. Krisher recommended that Dr. Weil continue to prescribe steroids and try Methotrexate instead of Soriatane. (*Id.*) Dr. Krisher recommended this treatment despite knowing the risks of prescribing Methotrexate, which he acknowledged when he ordered enzyme monitoring and Folic Acid (which is prescribed to combat kidney and liver side effects). (*Id.*; Expert Report of Dr. Carlson, Exhibit B-1 to Defs.' Mot. Summ. J., Doc. 40.)

In comparison to Soriatane, Methotrexate was a much less efficacious treatment for Mr. Darrah's condition and his concomitant pain. Though Defendants suggest that Methotrexate maintained Mr. Darrah's HPK in a "stable, pain-free" condition, his medical and grievance records indicate that Methotrexate did not treat his condition and ultimately caused him more pain than no treatment at all. (Darrah Decl., Ex. A at ¶ 3; Lacona Decl., Ex. C at 4; NOG July 11, Exhibit V.) After two months on Methotrexate, Dr. Weil noted that Mr. Darrah showed no

improvement and increased his dosage. (IPN Apr 11-Mar 12, Exhibit N at 3.) After three months

on Methotrexate, Mr. Darrah reported to Ms. Stanforth that he was in "severe pain, no matter

what I do" without any improvement in his condition. (NOG July 11, Exhibit V; ICR July 11,

Exhibit U; Darrah Decl., Exhibit A at ¶ 11.) Despite these reports to Dr. Weil and Ms. Stanforth,

both continued to maintain this ineffective treatment plan.

      In July 2011, Dr. Eddy was also informed that Methotrexate was less efficacious than

Soriatane and inadequate, but he continued Mr. Darrah's treatment on Methotrexate. In his

capacity as the State Medical Director for ODRC, Dr. Eddy was the "final medical authority in

the approval of . . . non-formulary drug requests." (Deposition of Andrew Eddy in *Lee v. Eller, et

al.*, attached as Exhibit AE at 26:7-16.) Dr. Eddy also saw photos of Mr. Darrah's feet, which

showed the fissures on his feet had not healed after three months on Methotrexate. (Lacona

Decl., Ex. C at 6.) In response to the photographs and his review of Mr. Darrah's medical

history,[9] Dr. Eddy decided to "continue with the current treatment plan at this time, which is

Methotrexate." (*Id.*) This demonstrates that Dr. Eddy knew of Methotrexate's ineffectiveness but

continued to prescribe it, disregarding Mr. Darrah's pain and suffering.

      Mr. Darrah continued to report no improvement in his condition in September 2011, and

Dr. Weil responded by again increasing the dosage of Methotrexate.  (Skin Compl. Sept 11, Ex.

Y; CDC Sept 11, Ex. Q.) In October 2011, Mrs. Darrah emailed Ms. Stanforth, stating "Kevin's

been on the highest dose of methotrexate for about two months now, and there's no improvement

to his feet." (Lacona Decl., Ex. C at 14.) On November 1, Dr. Weil noted that Mr. Darrah had

seen no improvement and that his fissures were not "closing like usual." (CDC Med. Data, Ex. P

---

[9] As part of his "normal procedure" for reviewing non-formulary requests, Dr. Eddy reviews "all" patient
records in a system called Patient OneView, which includes patient lab results, imaging reports,
medications, Ohio State University medical reports, patient clinics, a commissary list, and appointments.
(Transcript of Testimony of Andrew Eddy at 55:4–56:3, Lee v. Eller, et al., 2:13-CV-00087, 2013 WL
4052878 (S.D. Ohio May 23, 2014) (No. 76), attached as Exhibit AF.)

at 1; Darrah Decl., Ex. A at 3.) That same day, Mrs. Darrah emailed Ms. Stanforth, stating Methotrexate was actually making Mr. Darrah's condition worse: his "wounds begin to heal a bit and then open again, giving him no respite from pain at all." (Lacona Decl., Ex. C at 13.)

Each Defendant demonstrated deliberate indifference to Mr. Darrah's pain by knowingly disregarding the substantial evidence that Methotrexate was inadequate and inefficacious in treating Mr. Darrah's condition.  *See Ancata*, 769 F.2d at 704. Mr. Darrah suffered as a direct result of Defendants' decisions to prescribe a less efficacious treatment to Mr. Darrah. *See Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994). Though Defendants claim that Mr. Darrah's condition was treated "appropriately" in a timely fashion, the aforementioned records show that Mr. Darrah's condition *worsened* due to Defendants' "treatment" and he experienced near-constant pain for over a year.

In spite of this evidence, Defendants contend that Methotrexate was more effective and safer than Soriatane. (Defs.' Mot. Summ. J., Doc. 40 at 9.) In order to support this contention, Defendants rely on a study attached to the expert report of Dr. Rodney Carlson. (Doc. 40-11.) The study, conducted in India and published in September 2012, is not authoritative in this case and also cannot be generalized to Mr. Darrah. First, the study was not published until September 2012, well after Defendants had made the decisions to deny Soriatane and prescribe Methotrexate to Mr. Darrah. Therefore, this information was not available to Dr. Krisher, Dr. Weil, or Dr. Eddy when they each made medical decisions about Mr. Darrah's care. Second, none of the Defendants ever stated or claimed that Methotrexate was a more effective or appropriate treatment for HPK than Soriantane. Dr. Krisher denied the April 4, 2011, request for Soriatane because Soriatane is non-formulary, whereas Methotrexate is a formulary medication. (PA Req., Exhibit G at 1.) Finally, the study cited by Defendants included a very small sample

size that was not genetically diverse, so the results cannot be generalized to all patients with palmoplantar psoriasis. (*Id.*) These facts create a genuine dispute as to whether Defendants based their decisions on either the safety or efficacy of Methotrexate or Soriatane. (Defs.' Mot. Summ. J., Doc. 40 at 9.)

There are material disputes as to whether Methotrexate was less efficacious than Soriatane and whether Defendants nonetheless knowingly prescribed Methotrexate instead of Soriatane, in violation of Mr. Darrah's constitutional right to adequate medical care.

> b. Defendants denied Mr. Darrah Soriatane for non-medical reasons, which was a violation of his rights to individualized and adequate medical care.

Prison officials are deliberately indifferent if they deny or delay necessary medical treatment for non-medical reasons, because such actions are violations of a prisoner's right to adequate medical care. *See Ancata*, 769 F.2d at 704; *see also Monmouth Cnty.*, 834 F.2d at 347 (medical care can not be predicated on ability or willingness to pay ). Furthermore, each prisoner has a right to have "ultimate treatment decision[s]. . . made on a case-by-case basis," with due consideration given to their individual circumstances, needs, and history. *Delker v. Maas*, 843 F. Supp. 1390, 1399 (D. Or. 1994); *see also Monmouth Cnty.*, 834 F.2d at 347. In this case, Defendants denied Mr. Darrah adequate treatment for administrative and financial reasons. Soriatane is the only medication that has ever successfully treated Mr. Darrah's HPK, and it was prescribed by dermatologists prior to Defendants' abrupt discontinuation of the medication. (IPN Jan-Apr 2011, Ex. M at 1.) Defendants did not take into account Mr. Darrah's individual medical history when they denied Soriatane and prescribed Methotrexate, which "evince[d] deliberate indifference to the medical needs" of Mr. Darrah. *Id.* at 347 n.32.

Ms. Stanforth, in her capacity as Healthcare Administrator at Madison, failed to provide Mr. Darrah with adequate medical care by making decisions based on financial and

administrative considerations as opposed to Mr. Darrah's individualized medical needs. As
Healthcare Administrator, Ms. Stanforth was responsible for decisions about the deployment of
health resources, day-to-day operations of the medical services program, developing mechanisms
to ensure that services were provided and monitored, and providing "clinical and administrative
supervision to institution medical staff 24 hours a day, 7 days per week." (68-MED-01, Ex. AA
at VI(A)(2).) On the same day that Dr. Weil submitted the first non-formulary request for
Soriatane, Ms. Stanforth addressed Mr. Darrah's requests for treatment by suggesting that Mr.
Darrah acquire his own treatment, at his own cost, from an outside source. (IPN Jan-Apr 11, Ex.
M at 4.)

  In July 2011, Ms. Stanforth again diverted attempts to secure proper treatment for Mr.
Darrah, informing Mrs. Darrah that she should try to get his medically necessary treatment from
an outside doctor and pharmacy. (Lacona Decl., Ex. C at 14.) In email communications with
other ODRC employees and Mrs. Darrah, Ms. Stanforth called Soriatane "the more expensive
drug" and stated that it would not be prescribed because it was not on the formulary. (Stanforth
Interrog., Ex. AD at 5; Lacona Decl., Exhibit C at 13.) Though Ms. Stanforth had a responsibility
to ensure Mr. Darrah received adequate medical care, she neglected this responsibility based on
financial and administrative considerations instead of what medical care was best for Mr. Darrah.

  Dr. Krisher knowingly denied the non-formulary request for Soriatane for administrative
reasons and failed to provide any evidence that the decision was medical or individual in nature.
When asked what "medical advice [he] utilized" to deny Mr. Darrah Soriatane and prescribe
Methotrexate instead, Dr. Krisher stated that "medications on the ODRC formulary are used as a
treatment option prior to ordering non-formulary medications." (Krisher Interrogatories, Ex. AC
at 1; *see also* PA Req., Ex. G at 1 (noting "other rx available" as only reason for denial of PA).)

This is a non-medical justification for a medical decision that does not employ individualized assessments. Furthermore, Dr. Krisher made the (medical) decision to recommend Methotrexate without considering medical evidence. (*Id.*) The FDA-approved label for Methotrexate states that it should only be prescribed where other therapies failed <u>and</u> only after the patient receives a biopsy or dermatologic consultation. (Bozian Report, Exhibit B at 44.) Dr. Krisher knew of a therapy that was effective (Soriatane), and he did not order either a biopsy or dermatology consult before denying the non-formulary request for Soriatane and advising Dr. Weil to prescribe Methotrexate.  Dr. Krisher demonstrated deliberate indifference to Mr. Darrah's serious medical need when he denied Soriatane for "non-medical reasons." *Ancata*, 769 F.2d at 704.

Dr. Weil prescribed Methotrexate, a toxic and dangerous drug, based on administrative considerations and not based on Mr. Darrah's individual medical history. (Meds Jan-Apr 11, Ex. J at 4.) Although Dr. Weil initially requested Soriatane for Mr. Darrah based on his medical history, (PA Req., Ex. G at 1) he failed to undertake the necessary steps to determine if Methotrexate was safe before prescribing it to Mr. Darrah. Dr. Weil did not order a biopsy or a dermatology consult for Mr. Darrah before prescribing Methotrexate,[10] thus demonstrating that he made consequential medical decisions about Mr. Darrah for non-medical reasons and without considering Mr. Darrah's individual medical needs. (Meds Jan-Apr 11, Ex. J at 4.)

Dr. Eddy knowingly denied Mr. Darrah access to medically-necessary treatment, Soriatane, for non-medical reasons and then predicated this treatment on Mr. Darrah's willingness and ability to pay for the drug himself. Dr. Eddy claims that he appropriately denied Soriatane because "[m]edications on the ODRC's Drug Formulary should be used as a treatment

---

[10] There is no evidence that Defendants *ever* referred Mr. Darrah to a dermatologist for his skin condition from January 2011 to February 2012.

option prior to prescribing non-formulary medications." (Declaration of Andrew D. Eddy, Doc. 40-9 at ¶ 6..) This is an administrative justification for a decision that should be based on an individualized medical assessment. (Bozian Report, Ex. B at 9-10.)

Dr. Eddy's eventual approval of the non-formulary request was predicated on Mr. Darrah's willingness to pay for his own treatment and not on an individualized medical assessment, which would have resulted in Mr. Darrah receiving Soriatane much earlier. In January 2012, Dr. Eddy approved Mr. Darrah's request for Soriatane, (PA Req., Ex. G at 2) but only after Mr. Darrah had suffered for one year from "excruciating pain" due to his untreated HPK. (ICR March 11, Ex. S; *see also* Kite, Ex. T; ICR July 11, Ex. U; CDC Med Data, Ex. P.) The PA request from Dr. Weil stated that the 90 day supply was ordered from a Canadian pharmacy and "paid for by pt's wife." (*Id.*) ODRC does not "generally" allow inmates to "receive prescription medication or medically related items from outside sources," but exceptions are made for "medically necessary equipment." (68-MED-01, Ex. AA at IV(F)(2)(b) (emphasis added).) By allowing Mr. Darrah to purchase and receive his own medication from an outside source (with a prescription from an ODRC physician, Dr. Weil), Dr. Eddy acknowledged that Soriatane was a medically necessary treatment that Mr. Darrah was entitled to. Despite the knowledge and acknowledgment that Soriatane was medically necessary, Dr. Eddy continued to approve non-formulary requests stating Mr. Darrah would pay for his own medication, so "[t]here is no cost to us." (PA Req., Ex. G at 3, 5-6.) In June 2013, nine months after Mr. Darrah instituted this lawsuit, Dr. Eddy signed a non-formulary request that stated Soriatane "has already been approved for his wife to pay for it. There has been legal action and now the DRC is to pay for it. Trevor Clark, Esq [ODRC attorney] and Dr. Eddy are involved." (*Id.* at 6.) This circumstantial evidence could lead a reasonable trier of fact to conclude that Dr. Eddy

improperly made decisions about Mr. Darrah's medical care based on administrative and financial considerations.

Regardless of Defendants' denials, the facts viewed in the light most favorable to Mr. Darrah demonstrate that underline money was the reason Mr. Darrah suffered for thirteen months. His care was not predicated on medical evidence. When Soriatane was first requested, the immediate response was to have Mr. Darrah pay for it himself. (IPN Jan-Apr 11, Ex. M at 3.) The only reason Mr. Darrah began receiving Soriatane in February 2012 was because he and his wife paid for it. (PA Req., Ex. G at 2.) Every subsequent non-formulary request for Soriatane noted who was paying for the medication, indicating that this was an important part of approving or denying the *medical* request. (*Id.* at 3-6.) ODRC only began to pay for Mr. Darrah's medication once he instituted this litigation. (*Id.* at 6.) A reasonable jury could conclude that Mr. Darrah was improperly denied adequate medical treatment for non-medical (administrative and financial) reasons. *See Ancata*, 769 F.2d at 704 (recognizing that a "[d]elay in medical treatment cannot be justified as a means to coerce payment").

> c.  Defendants denied Mr. Darrah Soriatane, which was a treatment prescribed as part of a treatment plan, thereby demonstrating a deliberate indifference to Mr. Darrah's serious medical needs.

Defendants violated Mr. Darrah's rights when they knowingly interrupted his "prescribed plan of treatment."*Boretti*, 930 F.2d at 1154. The Sixth Circuit has "long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702. Defendants knew of Mr. Darrah's diagnosed medical condition and his prior treatment plan on Soriatane. *See supra* Section III.B.1.i. Defendants' denial of his requests to fulfill this treatment plan constitutes deliberate indifference. *See Santiago*, 734 F.3d at 590; *Monmouth*, 834 F.2d at 347; *see Blackstock v. Corr. Corp. of Am.*, 660 F. Supp. 2d 764, 770 (W.D. La. 2009) (finding deliberate

indifference where defendant "tried one thing after another—everything except what the specialist who the prison sent him to recommended"); *Carter v. Fagin*, 363 F. Supp. 2d 661, 663 (S.D.N.Y. 2005) (noting that subjective component is satisfied where defendant fails to provide recommended treatment despite recognizing its effectiveness).

From December 2006, Mr. Darrah was consistently and continuously prescribed Soriatane based on dermatologists' recommendations until his transfer to Madison in January 2011. (LeCI Med. R., Ex. L at 2; Carry Meds, Ex. H.) His diagnosis of HPK was indicated on his Inmate Health Problem List upon his arrival at Madison, and his prescription for Soriatane (generic version Acitretin) was listed on his Patient Transfer Summary. (Trans. and Intake Forms, Ex. F at 2, 4.) All Defendants had access to Mr. Darrah's medical records and would have had to consult these records in order to make medical determinations regarding his care.

From January to April 2011, Mr. Darrah also informed Defendants Stanforth and Weil of his need for treatment and of his prescribed treatment plan no fewer than eight times. *See supra* Section III.B.1.i. (IPN Jan-Apr 2011, Ex M at 1, 3; Skin Compl. Mar 11, Ex. X; ICR Mar 11, Ex. S; Kite, Ex. T.) In spite of these records and requests for his prescribed treatment, Defendants did not prescribe *any medications* for his HPK until April 7, nearly three months after he arrived at Madison. (Meds Jan-Apr 2011, Ex. J.) Dr. Weil prescribed Mr. Darrah Sinemet and Neurontin, two of the three medications listed on his Transfer Summary, but did not prescribe Soriatane. (*Id.*; Trans. and Intake, Ex. F at 2.) Dr. Weil failed to fill Mr. Darrah's prescription for Soriatane without even speaking to his patient, and in so doing violated ODRC policy 52-RCP-06, which mandates continuation of non-formulary medication for 14 days. (Darrah Decl., Ex. A at ¶ 8; 52-RCP-06, Ex. Z at IV(A)(5)(d).)

31

Dr. Krisher knew of Mr. Darrah's HPK diagnosis and of his prior treatment plan on Soriatane as prescribed by ODRC dermatologists, because the information was contained in the non-formulary request he denied. (PA Req., Ex. G at 1.) Dr. Krisher did not evaluate Mr. Darrah himself and denied the request of Dr. Weil, the only physician who *had* examined Mr. Darrah. In denying the PA request, Dr. Krisher overruled the treatment plan prescribed by dermatologists, as well as the previous non-formulary approval of Soriatane, which would have been obtained at Lebanon in late 2006 or early 2007. This denial of Soriatane was an "interruption of a prescribed plan of treatment" constituting a violation of Mr. Darrah's Eighth Amendment right to adequate health care. *Boretti*, 930 F.2d at 1154.

In July 2011, Dr. Eddy denied Mrs. Darrah's requests for her husband to be placed back on Soriatane. (Lacona Decl., Ex. C at 6.) As stated previously, Dr. Eddy has testified under oath that he always reviews all patient medical records in Patient OneView before making decisions about non-formulary drug requests. (Testimony Transcript, Ex. AF.) Therefore Dr. Eddy would have had access to Mr. Darrah's medical records, which indicated that he had been diagnosed with HPK before his transfer and that he had been prescribed Soriatane at Lebanon. (Trans. and Intake, Ex. F at 1.) Dr. Eddy's denial of Mrs. Darrah's request to reinstate Mr. Darrah's prescribed treatment demonstrated deliberate indifference to his serious medical need. *See Santiago*, 734 F.3d at 590; *Monmouth*, 834 F.2d at 347.

Mr. Darrah suffered for thirteen months as a <u>direct result</u> of Defendants' denial of Soriatane and provision of detrimental medical care. *See Horn*, 22 F.3d at 659 (requiring that Plaintiff's injury is a "proximate" result of Defendants' actions). Mr. Darrah experienced painful fissures once he was removed from his prescribed treatment plan in January 2011, and the pain from these fissures did not abate while Defendants prescribed him the cheaper formulary option,

Methotrexate. (Darrah Decl., Ex. A at ¶ 11 .) Defendants claim that their denial of Mr. Darrah's prescribed treatment, Soriatane, was "appropriate," and their actions were not the proximate cause of his pain. Therefore, there are genuine issues of material fact to be resolved at trial.

> ii. *Defendants also ignored a substantial risk of harm from infection when they denied and then delayed the provision of Soriatane and instead prescribed Methotrexate to Mr. Darrah.*

Because Defendants ignored "a substantial risk" that Mr. Darrah could face "serious harm" due to infection, *Farmer*, 511 U.S. at 847, they were deliberately indifferent to his constitutional rights. Mr. Darrah does not need to show "actual injury" in order to make out a claim of deliberate indifference. *Parrish v. Johnson*, 800 F.2d 600, 610 (6th Cir. 1986). Prison authorities may not be deliberately indifferent to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). There is a dispute as to whether Defendants placed Mr. Darrah at a substantial risk of serious harm by ignoring the risk that Mr. Darrah could contract an infection due to the immunosuppressive qualities of Methotrexate.

As stated previously under the objective component of this argument, Methotrexate slows healing and reduces the body's ability to fight infection, thereby increasing the risk that Mr. Darrah would contract an infection. *See supra* Section III.B.1.ii. Defendants knew that Mr. Darrah had open wounds on his feet and that he was exposed to dangerous bacteria at Madison, but they continued to treat him with an ineffective medication that put him at greater risk of contracting an infection.

Ms. Stanforth knew that Mr. Darrah was exposed to staph infections on his cell block, but she ignored this risk and continued to ignore Mr. Darrah's requests for Soriatane. Mr. Darrah and his wife repeatedly reported to Ms. Stanforth that Mr. Darrah was at risk of contracting a staph infection through the open wounds on his feet. (*See* ICR Mar 11, Ex. U; Kite, Exhibit T; Lacona

Decl., Ex. C at 4;  ICR July 11, Ex. U.) Ms. Stanforth knew, through direct email communications with Mrs. Darrah, that, while Mr. Darrah was on Methotrexate, other inmates on Mr. Darrah's cellblock contracted infections. (NOG July 11, Ex. V; Lacona Decl., Ex. C at 4.) One of the inmates lost a foot to an infection. (*Id.*) Prison officials can not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33. Despite Ms. Stanforth's knowledge of these conditions and her role as Healthcare Administrator, she failed to address the serious risk of farm Mr. Darrah faced while he was prescribed Methotrexate.

Dr. Weil had actual knowledge that Methotrexate was ineffective at healing the open wounds on Mr. Darrah's feet and therefore ignored a substantial risk that Mr. Darrah could contract an infection through his feet. *See supra* Section V.A.2.b at 25-27. During the ten months Mr. Darrah was prescribed Methotrexate, Mr. Darrah informed Dr. Weil on numerous occasions that the medication was not working and not healing his feet. (*See, e.g.*, IPN Apr 11-Mar 12, Ex. N at 4, 5; CDC Med Data, Ex. P at 1.) Thus, Dr. Weil knew that prescribing Methotrexate could put Mr. Darrah at serious risk of contracting an infection, which his immune system would not be able to fight. Dr. Weil ignored the risks of continuing to prescribe Methotrexate to Mr. Darrah, even after the wounds on Mr. Darrah's feet failed to heal for several months.

Dr. Eddy also knew that Mr. Darrah was at a serious risk of contracting an infection but ignored this risk by continuing to prescribe Methotrexate. In July 2011, Dr. Eddy was shown photo evidence that the fissures on Mr. Darrah's feet had not healed after three months on Methotrexate. (Lacona Decl., Exhibit C at 4; Stanforth Interrog., Exhibit AD at 10–29 .) In response to this evidence that Methotrexate's immunosuppressive properties were slowing Mr. Darrah's ability to heal, Dr. Eddy continued to deny Soriatane and recommend Methotrexate.

(*Id.*) On October 13, 2011, Dr. Eddy received a copy of the Chief Inspector's decision on Mr. Darrah's Grievance Appeal, in which the Chief Inspector restates Mr. Darrah's complaints that he was at risk of contracting a staph infection due to Methotrexate. (Decision of Chief Inspector on Grievance Appeal, attached as Exhibit W.) Therefore Dr. Eddy had actual knowledge that Mr. Darrah was at risk of infection, from Methotrexate's immunosuppressive properties and specifically from the presence of staph in the prison. Dr. Eddy ignored a substantial risk that Mr. Darrah could contract an infection through the open wounds on his feet, which his body would then be less capable of fighting due to the Methotrexate. This demonstrates that Dr. Eddy was deliberately indifferent to a serious risk of harm. *See Farmer*, 511 U.S. at 847.

At minimum, there are genuine issues of material fact as to whether Mr. Darrah's risk of infection due to Defendants' decisions to ignore the immunosuppressive effects of Methotrexare and the dangerousness of Mr. Darrah's environment satisfy the objective requirement for an Eighth Amendment claim. Thus, this issue should go to a jury.

### C. Defendants Violated a Clearly Established Constitutional Right and Should Not Be Granted Qualified Immunity.

Whether an official is entitled to qualified immunity is a question of law. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004). Qualified immunity does not protect officials from damage liability in federal civil rights cases if they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1987). Determining whether Defendants are entitled to qualified immunity requires a two-step analysis. *Scott v. Harris*, 550 U.S. 372, 277 (2007). The courts must determine: (1) whether the facts alleged or shown by the plaintiffs make out a violation of a federal statutory or constitutional right; and (2) whether that right was clearly established at the time of the defendants' alleged misconduct. *Roth v. Guzman*, 650 F.3d 603,

35

609 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir. 1996). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 635 (1987).

Because qualified immunity is a question of law, "if there is a disagreement as to the facts, the reviewing court must consider the evidence in the light most favorable to the plaintiff." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004). Once a plaintiff meets their burden of showing that a right was clearly established, the burden shifts to the defendants to show that "the challenged act was objectively reasonable in light of the law existing at the time. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). "If the legal question is dependent upon which version of facts one believes, then the jury must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000).

Here, for the reasons discussed above, there are genuine issues of fact regarding both the objective and subjective components of Mr. Darrah's Eighth Amendment claim. Therefore, a jury must determine liability, and summary judgment on the basis of qualified immunity is inappropriate.

Moreover, Mr. Darrah's constitutional right was "clearly established." A right is "clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2011). The source of law that clearly establishes such a right is "precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Holzemer v. City of Memphis,* 621 F.3d 512, 527 (6th Cir. 2010).

36

The claim of deliberate indifference to a serious medical condition is rooted in the Eighth Amendment's Cruel and Unusual Punishment Clause. The "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' [that is] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97 at 104 (1976)(citing *Gregg v. Georgia*, supra, 96 S.Ct. 2909, 2925 (1976)). Mr. Darrah alleges that the defendants violated his constitutional rights by delaying and denying a treatment prescribed by doctors and specialists as necessary to treat his serious medical condition. "[D]eliberate indifference to serious medical needs may be evidenced by an intentional denial or delay in access to medical care, or by an intentional interference with the treatment once prescribed." *Sherfield v. Matheny*, 820 F.2d 1225 (6th Cir. 1987)*; see generally Santiago*, 734 F.3d 585, 590 (6th Cir. 2013). Based on this case law, the alleged constitutional violation was clearly established at the time of this violation and a genuine issue of material fact still exists. Therefore, Defendants are not entitled to qualified immunity in this matter and the district court should not grant summary judgment.

**D.  This Court Has Personal Jurisdiction over Defendant Stanforth.**

As the parties conceded during a status conference, this Court has personal jurisdiction over all Defendants. (Scheduling Order, Doc. 20 at 1.) Despite their earlier concession, Defendants now claim that this Court does not have personal jurisdiction over Defendant Stanforth because Mr. Darrah failed to serve process on Ms. Stanforth. (Defs.' Mot. Summ. J., Doc. 40 at n.1.) However, Ms. Stanforth and the State have waived any defense of insufficient service of process or lack of personal jurisdiction by failing to raise it earlier.

**1.  Ms. Stanforth waived her defenses of insufficient service of process and lack of personal jurisdiction.**

First, Defendants conflate insufficient service of process with establishing personal jurisdiction, but "the actual existence of personal jurisdiction should be challenged by a Rule

12(b)(2) motion" separately from a 12(b)(5) motion for insufficient service of process. 5B.

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1353 (3d ed. 1998);

*see also Melson v. Kroger Co.*, 550 F. Supp. 1100, 1104 n.2 (S.D. Ohio 1982). Defendants filed

neither a 12(b)(2) motion nor a 12(b)(5) motion.

    Second, Ms. Stanforth has waived any objections to service of process or personal

jurisdiction by failing to raise them in her Answer. Rule 12 of the Federal Rules of Civil

Procedure requires defenses of lack of personal jurisdiction or insufficient service of process to

be raised at or before the filing of a responsive pleading. Fed. R. Civ. P. 12(b), 12(h). Ms.

Stanforth failed to assert either a defense of insufficient service of process or a defense of lack of

personal jurisdiction in the Answer, (Defs.' Answer, Doc. 6) but instead raised this point for the

first time in a footnote to the Motion for Summary Judgment (Defs.' Mot. Summ. J., Doc. 40).

Even if Ms. Stanforth *had* made a motion to assert insufficient service of process, she could not

later amend that motion to add a defense of lack of personal jurisdiction. F. R. Civ. P. 12(g).

Therefore, Ms. Stanforth has waived her right to assert that defense and has consented o the

jurisdiction of this court. F. R. Civ. P. 12(h); *see also Cent. States, Se. & Sw. Areas Health &

Welfare Fund v. First Agency, Inc.*, 13-2077, 2014 WL 2933225 (6th Cir. July 1, 2014);

*Anderson v. Sullivan*, 03CV4064 (DRH)(MLO), 2005 WL 1123772 (E.D.N.Y. May 9, 2005)

(denying defendant's motion to dismiss for lack of personal jurisdiction as untimely for failure

include that defense in his Answer, which only included insufficient service of process defense).

    Third, Defendant Stanforth has participated in this litigation for over a year and a half

without raising this defense. (Stanforth Interrog., Ex. AD.) Due to this extensive participation,

even if the Defendant had preserved the defense of lack of personal jurisdiction, that defense

would be forfeit due to her extensive participation. *See King v. Taylor*, 694 F.3d 650, 658 (6th

Cir. 2012) (finding that, even where a defense is raised, a defendant can forfeit the defense through "extensive participation in the litigation").

Finally, exercising personal jurisdiction over Ms. Stanforth would comport with Due Process and the state's jurisdictional statute, Ohio Rev. Code § 2307.382, which a federal court would look to for personal jurisdiction. F. R. Civ. P. 4(k)(1)(A). As a citizen and domiciliary of Ohio, as well as an employee of the State of Ohio, Ms. Stanforth's "conduct and connection with the forum State [Ohio] are such that [s]he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1986).

### 2. The State of Ohio, as legal representative for Ms. Stanforth, waived her defenses of insufficient service of process and lack of personal jurisdiction.

The State claims that defenses at law are not waived where the Ohio Attorney General appears in a civil action on behalf of an officer or employee, pursuant to Ohio Rev. Code § 109.361. (Defs.' Mot. Summ. J., Doc. 40 at n.1.) However, this assertion is not contained in or supported by the text of Ohio Rev. Code Chapter 109. Instead, § 109.361 states, "the attorney general, . . . in addition to providing the defense of the officer or employee, may file counterclaims and cross-claims and engage in third-party practice on behalf of the officer or employee." Ohio Rev. Code § 109.361. Therefore, in its capacity as legal counsel acting "on behalf of" Defendant Stanforth, the State has waived the defenses of insufficient service of process and personal jurisdiction by failing to include those defenses in the Answer, (Defs.' Answer, Doc. 6) only raising them for the first time in footnote 1 of the Motion for Summary Judgment (Defs.' Mot. Summ. J., Doc. 40). *See also King*, 694 F.3d at 656 (finding that the state waived the defense of insufficient service of process for failing to also include a 12(b)(5) motion in the motion to dismiss).

**IV.     CONCLUSION**

For the reasons discussed above, this Court should deny Defendants' Motion for Summary Judgment on the issues of deliberate indifference and qualified immunity. There are numerous, genuine issues of material fact in this case that must be resolved by a jury at trial.


Respectfully submitted,

/s/ David A. Singleton
DAVID A. SINGLETON (0074556)
Ohio Justice & Policy Center
215 E. 9th Street, Suite 601
Cincinnati, Ohio 45202
(513) 421-1108 Phone
(513) 562-3200 Fax
dsingleton@ohiojpc.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 24, 2014, a copy of the foregoing Plaintiff's Response and

Memorandum in Opposition to Defendants' Motion for Summary Judgment was filed

electronically. Notice of this filing will be sent to all parties by operation of the court's electronic

filing system.

/s/ David A. Singleton
DAVID A. SINGLETON (0074556)
