IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN D. DARRAH,

      Plaintiff,

  vs.                          Civil Action 2:12-cv-899
                                      Judge Smith
                                      Magistrate Judge King

DR. KRISHER, *et al.*,

      Defendants.

<u>REPORT AND RECOMMENDATION</u>

Plaintiff, a former inmate at Lebanon Correctional Institution ("LeCI") and current inmate at the Madison Correctional Institution ("MaCI"), brings this civil rights action under 42 U.S.C. § 1983 claiming a denial of his right under the Eighth Amendment to the United States Constitution for denial of medical care.  This matter is before the Court on *Defendants Eddy, Krisher, Weil and the State of Ohio on Behalf of Karen Stanforth's Motion for Summary Judgment*, Doc. No. 40 ("*Motion for Summary Judgment*").  For the reasons that follow, it is **RECOMMENDED** that the *Motion for Summary Judgment* be **GRANTED in part and DENIED in part**.

I.    BACKGROUND

The Ohio Department of Rehabilitation and Correction ("ODRC") maintains "a Drug Formulary, specifically developed for the ODRC and its institutions, that lists standardized medications that may be prescribed and dispensed for inmates without prior authorization from . . . the ODRC Office of Correctional Health Care ["Drug Formulary"]."

*Declaration of Andrew D. Eddy, M.D.*, Doc. No. 40-9, ¶ 4 ("*Eddy Declaration*").[1]  "Medications not listed on the Drug Formulary [non-formulary drugs] require authorization prior to prescribing or administering to inmates." *Id.* at ¶ 5.  To obtain prior authorization, an advanced level provider must submit a "Request for Non-Formulary Drug Prior Authorization" ("PA request") to the ODRC Office of Correctional Health Care. *Id.* at ¶ 5.  Formulary medications "should be prescribed before prescribing non-formulary medications." *Id.* at ¶ 6.

Plaintiff entered the Correctional Reception Center ("CRC") on September 25, 2006. *Declaration of Kevin Darrah* ("*Darrah Declaration*"), Doc. No. 44-1, ¶ 1; *Declaration of Brian Wittrup* ("*Wittrup Declaration*"), Doc. No. 51-2, ¶ 4.[2]  Prior to his incarceration, plaintiff was diagnosed with plantar hyperkeratosis ("HPK")[3] at the Cleveland Clinic. *Darrah Declaration*, at ¶ 2; Doc. No. 44-4, PAGEID#:401 (Cleveland Clinic chart note dated August 30, 2005). HPK, a form of psoriasis, is a congenital disease that causes skin to thicken and build up on plaintiff's feet, creating thick calluses that crack open and form fissures. *Id.*; *Rodney L. Carlson, D.P.M.'s Expert*

---

[1] Defendant Eddy is a licensed doctor board certified in Internal Medicine. *Id.* at ¶¶ 2-3.
[2] Brian Wittrup, the Chief of ODRC's Bureau of Classification, has access to the transfer history of current ODRC inmates. *Id.* at ¶¶ 2-3.
[3] Throughout the record, the parties use various terms to refer to plaintiff's skin condition. *See*, *e.g.*, *Motion for Summary Judgment*, pp. 3, 10 (referring to "Plantar Keratoderma"); *Plaintiff's Response and Memorandum in Opposition to Defendant's* [sic] *Motion for Summary Judgment*, Doc. No. 44, pp. 1-2 ("*Opposition*") (referring to page numbers appearing at the bottom of page) (referring to "plantar hyperkeratoderma" and "HPK"). The record does not reflect a material distinction between these terms. For ease of reference, the Court will therefore refer to plaintiff's skin condition simply as "HPK."

Report ("*Carlson Expert Report*"), Doc. No. 40-3, PAGEID#:255 ("*Carlson Expert Report*");[4] *Declaration of Dr. Richard Bozian in Support of Plaintiff's Opposition to Motion for Summary Judgment*, Doc. No. 44-2, PAGEID#:340 - PAGEID#:341 ("*Bozian Declaration*"); *Expert Report of Dr. Richard Bozian*, Doc. No. 44-2, PAGEID#:432 - PAGEID#:384 ("*Bozian Report*").[5] The Cleveland Clinic prescribed Soriatane, a second generation retinoid used to treat severe psoriasis conditions. Doc. No. 44-4, PAGEID#:401; *Darrah Declaration*, ¶ 4; *Carlson Expert Report*, PAGEID#:255 (noting further that Acitretin is another name for Soriatane); *Eddy Declaration*, ¶ 7 (same); Doc. No. 40-8, PAGEID#:268 (same).

On November 29, 2006, plaintiff was transferred from CRC to MaCI and, on December 22, 2006, to LeCI. *Wittrup Declaration*, ¶¶ 5-6. Corrections Medical Center ("CMC") dermatologists examined plaintiff in December 2006 and noted that his HPK had been "successfully treated" with Soriatane and that "[m]ultiple other treatments [were] ineffective." Doc. No. 44-5, PAGEID#:405 (CMC consultation requests dated December 14 and 21, 2006). The CMC dermatologists at LeCI prescribed Soriatane, a non-formulary medication. *Darrah Declaration*, ¶ 5; *Declaration of Jennifer A. Clayton, R.N., B.A., C.C.H.P.*, Doc. No. 51-3, ¶¶ 7, 9 ("*Clayton Declaration*");[6] Doc. No. 44-5, PAGEID#:405

---

[4] Rodney L. Carlson is a contracting podiatrist with ODRC. *Declaration of Rodney L. Carlson*, Doc. No. 40-2, ¶ 2 ("*Carlson Declaration*").
[5] Richard Bozian, M.D., F.A.C.P. is plaintiff's medical expert who is a medical doctor licensed to practice medicine in the State of Ohio. *Bozian Report*, p. 1.
[6] Jennifer A. Clayton, a licensed Registered Nurse, is the Director of Nursing for ODRC's Office of Correctional Healthcare. *Id.* at ¶¶ 2, 4-5.

- PAGEID#:406 (CMC dermatology consultation requests and reports dated December 14 and 21, 2006; June 20, 2007; and September 5, 2007). In September 2007, plaintiff reported "good results" with this drug, *id*. at PAGEID#:406, and the medical records reflect that plaintiff's HPK was "much improved on Soriatane" in December 2007. Doc. No. 44-5, PAGEID#408 (Consultation report and recommendations dated December 20, 2007). Plaintiff continued to be successfully treated with Soriatane while he was incarcerated at LeCI. *Darrah Declaration*, at ¶ 5; Doc. No. 44-5, PAGEID#407 - PAGEID#:410 (Consultation requests and report and recommendations dated through April 2009).

On January 18, 2011, plaintiff was transferred from LeCI back to MaCI. *Wittrup Declaration*, ¶ 7. On January 31, 2011, he was seen in Nursing Sick Call ("NSC") and reported that he had not received Soriatane since his transfer to MaCI. Doc. No. 40-1, PAGEID#:252 (interdisciplinary progress notes dated January 31, 2011). On the same day, nursing personnel contacted defendant Dr. David C. Weil about ordering Soriatane. *Id.*; Doc. No. 40-5, PAGEID#265 (form labeled "Orders" dated January 31, 2011). On February 17, 2011, plaintiff was again seen in NSC and inquired about reordering Soriatane, but he did not complain of pain during this visit. Doc. No. 40-1, PAGEID#:252 (interdisciplinary progress notes dated February 17, 2011).

Defendant Weil examined plaintiff on March 2, 2011, noting that plaintiff's heels were fissuring, but that plaintiff was in no apparent distress. Doc. No. 40-6, PAGEID#:266 (interdisciplinary

progress notes dated March 2, 2011).  Defendant Weil also noted that
plaintiff had previously used Soriatane, with "good effect[,]"and that
other creams had had no effect, requiring plaintiff to walk on his
toes.  Doc. No. 40-1, PAGEID#:252 (interdisciplinary progress notes
dated March 2, 2011).  Defendant Weil went on to note that plaintiff
was under the impression that his prior authorization for Soriatane
was still in effect.  Doc. No. 40-6, PAGEID#:266.  Defendant Weil
ordered plaintiff's previous medical charts, a copy of the most recent
prior authorization for Soriatane, and Soriatane for plaintiff.  Doc.
No. 40-5, PAGEID#:265 (form labeled "Orders" dated March 2, 2011);
Doc. No. 44-10, PAGEID#:428 (form labeled "Orders" dated March 28,
2011, referencing, *inter alia*, order placed March 22, 2011).
Defendant Weil further instructed plaintiff to "kite" (send a note) if
he did not receive a response.  Doc. No. 40-6, PAGEID#:266.

Plaintiff filed an informal complaint on March 19, 2011,
complaining that, because he was not taking Soriatane, he was "in
excruciating pain" and had "open wounds that [made him] more
susceptible to staph infection."  Doc. No. 44-19, PAGEID#:465
(informal complaint resolution signed by plaintiff on March 19, 2011)
(emphasis in original).  On about March 22, 2011, plaintiff sent a
kite to MaCI's medical department, again complaining that, because he
was not taking Soriatane, he had "two very large fissures (one on each
heel)" that were "causing excruciating pain" which placed him "in a
great deal of danger for staph infection."  Doc. No. 44-20,
PAGEID#:466 (emphasis in original).  On the same day, plaintiff also

5

filed a skin complaint form, complaining that he was not receiving proper treatment for his feet.  Doc. No. 44-24, PAGEID#:470. Defendant Karen Stanforth responded by arranging for plaintiff to meet with defendant Weil on March 22, 2011.  Doc. No. 44-19, PAGEID#:465 (response to informal complaint dated March 22, 2011).  On that day, defendant Weil again placed an order for Soriatane.  Doc. No. 44-10, PAGEID#:428 (form labeled "Orders" dated March 28, 2011, referencing, *inter alia*, order placed March 22, 2011).

Upon examination on March 28, 2011, defendant Weil noted "large plaques/fissures" on plaintiff's heels.  Doc. No. 44-13, PAGEID#:448 (interdisciplinary progress notes dated March 28, 2011).  During this visit, plaintiff was upset because he had not yet received Soriatane for his heels.  *Id.*  On the same day, defendant Weil again attempted to reorder this medication.  Doc. No. 44-10, PAGEID#:428 (form labeled "Orders" dated March 28, 2011).  Because of plaintiff's pain and difficulty walking, defendant Weil placed plaintiff on medical lay-in for 20 days.  Doc. No. 44-24, PAGEID#:472 (medical restriction statement dated March 28, 2011); *Darrah Declaration*, ¶ 10.

Defendant Weil examined plaintiff again on April 4, 2011, and noted "plaque and fissures" on plaintiff's heels.  Doc. No. 44-13, PAGEID#:449 (interdisciplinary progress note dated April 4, 2011). Defendant Stanforth also examined plaintiff on that day and noted "several calluses with some deep cracks/fissures at heel areas.  No signs of infection identified."  *Id.*  Plaintiff expressed frustration with his inability to obtain Soriatane.  *Id.*  On the same day,

defendant Weil submitted a prior authorization requesting Soriatane for plaintiff.  Doc. No. 40-8, PAGEID#:268 ("Request for Non-Formulary Drug Prior Authorization" form dated April 4, 2011).  In support of this request, defendant Weil explained that plaintiff's heels were "very hard, fissured" and that plaintiff was "walk[ing] on [his] toes[.]"  *Id*.  Defendant Weil further explained that plaintiff had been on Soriatane since entering ODRC's custody until plaintiff was transferred to MaCI from LeCI.  *Id*.  Defendant Weil went on to explain that other steroid creams had not helped plaintiff's condition.  *Id*.

On April 6, 2011, defendant Dr. Krisher denied the PA request for Soriatane, explaining that an alternative formulary medication, Methotrexate, was available.  *Id*.; *Eddy Declaration*, ¶¶ 7-8.  Defendant Krisher ordered that "high potency steroids" and folic acid be used and that another medication, Dovenex, be prescribed as needed.  Doc. No. 40-8, PAGEID#:268; *Eddy Declaration*, ¶ 8.  Defendant Krisher further ordered that plaintiff's liver enzymes be monitored.  *Id*.

During a telephone conference on April 7, 2011, defendant Stanforth advised plaintiff and plaintiff's wife, Lacona Darrah, that defendant Krisher had denied the request for Soriatane.  Doc. No. 44-13, PAGEID#:450 (interdisciplinary progress notes dated April 7, 2011).  Upon defendant Stanforth's recommendation, plaintiff agreed to try Methotrexate.  *Id*.  Dr. Weil was advised of this decision and prescribed this medication following "priority lab draws" to assess plaintiff.  *Id*.  On April 11, 2011, plaintiff picked up the Methotrexate and folic acid for self-administration, verbalizing his

7

understanding of the dosage instructions.  Doc. No. 40-10, PAGEID#:273 (interdisciplinary progress notes dated April 11, 2011).

Although plaintiff reported to the infirmary at least ten times after beginning Methotrexate, the progress notes do not refer to plaintiff's HPK again until June 14, 2011.  Doc. No. 44-14, PAGEID#:451 - PAGEID#:453 (interdisciplinary progress notes dated April 13, 2011 through May 26, 2011).  On that date, defendant Weil examined plaintiff who reported that his feet were "no worse but no better[.]"  Id. at PAGEID#:453.  Upon plaintiff's request, defendant Weil increased plaintiff's Methotrexate dosage.  Id.

On July 7, 2011, plaintiff filed an informal complaint, complaining that, because he was not taking Soriatane, he was "in constant, severe pain" and "prone to infection[.]"  Doc. No. 44-21, PAGEID#:467 (informal complaint resolution submitted by plaintiff on July 7, 2011) (emphasis in original).  In response to this complaint, defendant Stanforth discussed plaintiff's HPK with Defendant Weil "who [had] concerns that [plaintiff claimed] 'severe' pain yet . . . told [defendant Weil that plaintiff] want[ed] to 'run on the track.'"  Id. Defendant Stanforth advised plaintiff that "[t]his is conflicting information and difficult to understand.  We offered a wheelchair for long distance walking but, again, you declined this and instead want to 'run' on your painful feet. (?)"  Id.  Defendant Stanforth further advised plaintiff to sign up for sick call so defendant Weil could determine if a stronger dose of Methotrexate was needed.  Id.

On July 28, 2011, plaintiff filed a grievance, explaining that

"the Level of pain in my feet is the same whether I'm sitting, standing, walking, or running. . . . I run to stay in good health.  If I'm going to be in severe pain, no matter what I do, I might as well try to stay Healthy."  Doc. No. 44-22, PAGEID#:468 (notification of grievance signed by plaintiff on July 28, 2011 that stated further that "[a]n inmate in my block just had a foot amputated because of an infection").  Plaintiff complained that the Methotrexate was "not working" and that he was at a "high risk of infection" because of another inmate's recent staph infection diagnosis.  *Id*.  Plaintiff went on to contend that Soriatane had "cleared up" his HPK and asked that he be prescribed that medication "immediately."  *Id*.[7]

On that same day, plaintiff was seen for a podiatry consultation. Doc. No. 44-14, PAGEID#:454.  The podiatry note reflects "multiple areas of severe HPK buildup" with "pain to palpitation."  *Id*. Plaintiff's HPK lesions were debrided.  Nevertheless, it was noted that plaintiff's "palmo-plantar keratoderma" was "stable in nature." *Id*.

Thereafter, plaintiff continued to be seen for follow-up visits. *Id*. (reflecting three examinations in August and September 2011).  On September 17, 2011, plaintiff filed a skin complaint form, complaining that he had obtained no relief from HPK affecting both soles of his feet.  Doc. No. 44-25, PAGEID#:473.  An assessment revealed rough scaling on plaintiff's soles.  *Id*.  Plaintiff was advised to continue

---

[7] On appeal, the Chief Inspector concluded on October 13, 2011 that "the medical staff is giving you proper care within the ODRC guidelines."  Doc. No. 44-23, PAGEID#:469 (*Decision of the Chief Inspector on a Grievance Appeal*).

taking his medications as prescribed, to maintain good hygiene, to apply cool compresses to reduce itching, and to avoid irritating soaps/detergents. *Id.* at PAGEID#:474. At his request, plaintiff was also referred to "Doctor Sick Call" ("DSC") for evaluation. *Id.*

Defendant Weil examined plaintiff on November 1, 2011, and noted plaintiff's complaint that the Methotrexate provided no benefit and that his heel fissures were not closing. Doc. No. 44-16, PAGEID#:459 ("Chronic Disease Clinic Baseline Medical Data" dated November 1, 2011). Defendant Weil noted fissures on both heels and prescribed another medication, Elavil, for "pain for [the] time being[.]" *Id.* at PAGEID#:460 - PAGEID#:461.

Plaintiff had a follow-up visit in DSC on November 15, 2011. He complained that the Methotrexate had had no effect on his HPK. Doc. No. 44-14, PAGEID#:454 (interdisciplinary progress notes dated November 15, 2011). The record reflects that an "attempt to restart Soriatane" would be made through plaintiff's private insurance "or Canada." *Id. See also id.* at PAGEID#:455 (reflecting that on November 17, 2011 plaintiff was advised that a prescription for Soriatane would be placed at plaintiff's chosen pharmacy and that plaintiff would "either enroll privately [through his wife] . . . or secure Canadian supply[.]"). *Id.*

On November 21, 2011, a prescription for Soriatane was placed at a non-ODRC pharmacy. *Id.* A December 29, 2011 notation indicates that there was a "custody issue . . . [with the] entry of [the] box of Soriatane." *Id.* at PAGEID#:455 - at PAGEID#:456. On January 26,

2012, defendant Weil filed a PA request to permit plaintiff to receive the Soriatane that Ms. Darrah had purchased.  Doc. No. 44-7, PAGEID#:418 ("Request for Non-Formulary Drug Prior Authorization" dated January 26, 2012).  Defendant Eddy approved the request, permitting a 90-day prescription.  *Id*.  Plaintiff received the Soriatane sometime in February 2012.  Doc. No. 44-14, PAGEID#:457 (interdisciplinary progress notes dated March 12, 2012, noting that plaintiff has been taking Soriatane for one month).  During a podiatry examination on March 12, 2012, plaintiff reported that his feet had improved after using Soriatane for a month.  *Id*.  A nurse requested a new order for Soriatane on March 21, 2012 "so wife [Ms. Darrah] may order it again (comes from Canada)[,]" noting that the medication helps plaintiff's feet.  *Id*.  This request was granted.  *Id*.

A chronic disease follow-up examination on April 23, 2012 revealed that plaintiff's foot "lesions are almost gone.  Just some scaly flakes remain."  Doc. No. 44-18, PAGEID#:464 ("Chronic Disease Clinic Follow Up" dated April 23, 2012).  Subsequent evaluations revealed continued improvement.  *Id*.  Defendant Weil submitted additional PA requests for Soriatane (at Ms. Darrah's expense), which were approved by defendant Eddy.  *Id*.; Doc. No. 44-7, PAGEID#:419 - PAGEID#:422.

Plaintiff filed this action on September 28, 2012, asserting various claims against several MaCI and ODRC employees.  *Complaint*,

11

Doc. No. 3.[8]  The Court permitted plaintiff's Eighth Amendment claims for deliberate indifference to a serious medical need against defendants Weil, Krisher, Eddy, and Stanforth to proceed.  *Initial Screening Report and Recommendation*, Doc. No. 4, p. 10; *Order*, Doc. No. 7 (adopting and affirming recommendation).  After the filing of this action, ODRC began to pay for plaintiff's Soriatane.  Doc. No. 44-7, PAGEID#:422.

Defendants now move for summary judgment on plaintiff's claims, and plaintiff, who is represented by counsel, opposes the motion.  *See Opposition*.  With the filing of *Defendants Eddy, Krisher, Weil and the State of Ohio on Behalf of Karen Stanforth's Reply in Support of Their Motion for Summary Judgment*, Doc. No. 51 ("*Reply*"), this matter is ripe for resolution.

**II.   DEFENDANT KAREN STANFORTH**

The parties disagree whether plaintiff effected service on defendant Stanforth and whether this Court has personal jurisdiction over this defendant.  By way of relevant background, on September 28, 2012, the Court recommended that plaintiff's Eighth Amendment claims for deliberate indifference against the defendants be permitted to proceed.  *Initial Screening Report and Recommendation*, Doc. No. 4, p. 10.  The Court thereafter granted plaintiff's request for leave to proceed *in forma pauperis*, and directed the Clerk of this Court to mail a courtesy copy of the *Complaint* and a copy of the order granting

---

[8] Plaintiff and another inmate originally joined in the single *Complaint*.  The Court concluded that the claims of these two inmates had been improperly joined and directed the Clerk to create two separate case files addressing the claims separately.  *Initial Screening Report and Recommendation*, Doc. No. 4.

such leave to the Attorney General of Ohio, Criminal Justice Section. *Order*, Doc. No. 5, p. 2.

On October 22, 2012, defendants Krisher, Eddy, Weil and Stanforth filed an answer to the *Complaint*. *Answer of Defendants with Jury Demand*, Doc. No. 6 ("*Answer*"). The *Answer* does not assert a defense based on insufficiency of service of process or lack of personal jurisdiction. On the same day, the Court directed the United States Marshals Service to effect service of process on, *inter alios*, defendant Stanforth. *Order*, Doc. No. 7, p. 1. The summons directed to defendant Stanforth was signed on November 8, 2012 by one Kelly Graves, apparently an employee of ODRC. Doc. No. 11, pp. 7-9 (reflecting the signature of Kelly Graves). On December 5, 2012, however, the summons was returned to the Court with a note on the exterior envelope advising to "RETURN TO SENDER UNABLE TO FORWARD[.]" Doc. No. 12-1. On April 3, 2013, the Court conducted a conference during which "[t]he parties agree[d] that the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, that the Court has personal jurisdiction over the parties and that venue is proper." *Scheduling Order*, Doc. No. 20, p. 1.

In moving for summary judgment, defendants and the State of Ohio now argue in a footnote that "[t]he docket reflects that service was returned as unexecuted as to Defendant Stanforth (Doc #:12), and accordingly this Court does not have personal jurisdiction over her." *Motion for Summary Judgment*, p. 1 n.1. Plaintiff disagrees, arguing that defendants and the State improperly conflate insufficient service of process with establishing personal jurisdiction and that defendant

13

Stanforth has waived and/or forfeited[9] her defenses of insufficiency of service of process and lack of personal jurisdiction. *Opposition*, pp. 37-39.

"Although the questions of personal jurisdiction and service of process are closely interrelated, service of process is merely the means by which a federal court gives notice to the defendant and asserts jurisdiction over [that defendant.]" *King v. Taylor*, 694 F.3d 650, 658-59 (6th Cir. 2012) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1353 at 338 (3d ed. 2004)) (internal quotation marks omitted). *See also* Fed. R. Civ. P. 12(b) (listing separately the defenses of lack of personal jurisdiction and insufficient service of process). "[W]ithout proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant." *King*, 694 F.3d at 655. "[I]n the absence of personal jurisdiction, a federal court is 'powerless to proceed to an adjudication.'" *Id.* (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). Accordingly, the Court will first consider defendant Stanforth's service defense.

A plaintiff has the duty of serving the summons and complaint in accordance with Rule 4 and within the time allowed by Rule 4(m). Fed. R. Civ. P. 4(c)(1). *See also* Fed. R. Civ. P. 4(m) (requiring a court to dismiss without prejudice an action against a defendant if that defendant is not served within 120 days after the complaint is filed, but that "if the plaintiff shows good cause for the failure [to effect

_____

[9]Because "waiver is the intentional relinquishment or abandonment of a known right[,]" "when considering whether a defendant has unintentionally lost the defense through his delay and participation in the litigation, the issue is more properly considered one of forfeiture." *King*, 694 F.3d at 658 n.3 (internal quotation marks omitted).

service], the court must extend the time for service for an
appropriate period"). "Due process requires proper service of process
for a court to have jurisdiction to adjudicate the rights of the
parties." *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345,
353 (6th Cir. 2003). It follows that "[a]ctual knowledge of a lawsuit
does not substitute for proper service under Fed. R. Civ. P. 4."
*Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 623
(6th Cir. 2004). A party may file a motion challenging the
sufficiency of service of process and a court may therefore dismiss a
complaint for "insufficient service of process." Fed. R. Civ. P.
12(b)(5). "When service of process is challenged, the burden rests
with the plaintiff to establish that service is properly made."
*McGath v. Hamilton Local Sch. Dist.*, 848 F.Supp.2d 831, 836 (S.D.Ohio
2012).

However, a party may waive or forfeit the defenses of
insufficient service of process and lack of personal jurisdiction by
either failing to include the defenses in a responsive pleading (or in
a Rule 15(a)(1) amendment) or by failing to file a Rule 12(b)(5)
motion. Fed. R. Civ. P. 12(h)(1). *See also Cent. States, Southeast &
Southwest Areas Health & Welfare Fund v. First Agency, Inc.*, 756 F.3d
954, 959 (6th Cir. 2014); *Fisher v. Merryman*, No. 01-6129, 32 Fed.
Appx. 721, at *723 (6th Cir. Mar. 21, 2002). As noted *supra*, defendant
Stanforth did not assert either of these defenses in her *Answer,* nor
did she file a motion under Rule 12(b)(5). Instead, this defendant
waited more than eighteen months, until the summary judgment stage,
before raising the issue in a footnote. Moreover, defendant
Stanforth's voluntary, active, and extensive participation in this

15

action unquestionably gave plaintiff a "reasonable expectation" that this defendant would defend plaintiff's claims on the merits.  *See King*, 694 F.3d at 660.  Under all these circumstances, this Court concludes that defendant Stanforth has waived or forfeited her right to object to this Court's exercise of jurisdiction over her. Fed. R. Civ. P. 12(h)(1).  *See also King*, 694 F.3d at 658-61.

Defendants' reliance on O.R.C. § 109.361 does not militate a different result.  *See Motion for Summary Judgment*, p. 1 n.1 (arguing that the Ohio Attorney General's appearance on defendant Stanforth's behalf "does not waive personal service and any defenses available at law"); *Reply*, p. 1 n.1 (same).  This statute provides that the Ohio Attorney "shall represent and defend the officer or employee in any civil action instituted against the officer or employee" and does "not prohibit the attorney general from entering his appearance in a case to protect the interest of the state even though no request for the appearance has been made by the officer or employee." O.R.C. § 109.361.  Nothing in the plain language of this statute provides an exception to waiver under Rule 12(h)(1) or otherwise addresses waiver or forfeiture of the personal jurisdiction defense.  Defendant Stanforth cites to no authority that supports her assertion that O.R.C. § 109.361 excuses her failure to preserve a defense based on insufficiency of service of process or lack of personal jurisdiction. In short, the Court concludes that it may exercise personal jurisdiction over defendant Stanforth.

The Court notes that the motion for summary judgment, as it relates to defendant Stanforth, is based only on the defenses of insufficient service of process and personal jurisdiction.  *See Motion*

*for Summary Judgment*, p. 1 n.1; *Reply*, pp. 1 n.1, 15.  The Court now turns to the merits of the claims against defendants Krisher, Eddy and Weil (collectively, "the defendant doctors").

**III.  *MOTION FOR SUMMARY JUDGMENT***

    **A.  Standard**

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the non-moving party must support the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified

pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.* *See also* Fed. R. Civ. P. 56(c)(3).

### B.  Official Capacity Claims

Plaintiff brings this action against Dr. Krisher, "an agent of the State of Ohio"; Dr. Andrew Eddy, ODRC's "Chief Medical Officer"; and Dr. David Weil, MaCI's "C[hief] M[edical] O[fficer]/Advanced Level Provider[,]" in their official and individual capacities pursuant to 42 U.S.C. § 1983.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction [*10] thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  A *prima facie* case under § 1983 requires evidence of (1) conduct by an individual acting under color of state law, and (2) the deprivation of a right secured by the Constitution or laws of the United States.  *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  Section 1983 merely provides a vehicle for enforcing individual rights found elsewhere and does not itself establish any substantive rights.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

In the case presently before the Court, plaintiff alleges that

19

defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution and are liable in their official capacities. *See*, *e.g.*, *Complaint*, ¶¶ 14, 19, 22, 185-205. Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)).

Plaintiff alleges that Dr. Krisher is an agent of the State of Ohio; that defendant Eddy is ODRC's agent; and that defendant Weil is MaCI's agent. *Complaint*, ¶¶ 14, 19, 22. However, the State of Ohio, ODRC and MaCI are immune from suit in this Court by virtue of the Eleventh Amendment to the United States Constitution. *See*, *e.g.*, *Beil v. Lake Erie Corr. Records Dep't*, No. 06-3155, 282 F. App'x 363, at *366 (6th Cir. June 13, 2008). *See also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (stating that Eleventh Amendment sovereign immunity applies not only to the states themselves but also to "state agents and state instrumentalities"). The Eleventh Amendment does not, however, preclude official capacity claims for prospective injunctive relief. *Ex parte Young*, 209 U.S. 123 (1908).

Plaintiff seeks monetary damages and a judgment declaring that defendants' failure to provide medical care violated plaintiff's Eighth Amendment rights. *Complaint*, p. 42. Plaintiff's requested

declaration would be retroactive in nature.  *See*, *e.g.*, *Dye v. Hatfield*, No. 1:12-cv-1204, 2013 U.S. Dist. LEXIS 159010, at *3 (W.D. Mich. Oct. 10, 2013), *adopted by, objection overruled by, dismissed in part by Dye v. Hatfield*, No. 1:12-cv-1204, 2013 U.S. Dist. LEXIS 158094 (W.D. Mich. Nov. 5, 2013); *Sandy Frank Prods. LLC v. Mich. Film Office*, No. 11-10933, 2012 U.S. Dist. LEXIS 399, at *10-11 (E.D. Mich. Jan 4, 2012).  Because plaintiff seeks only retroactive relief and monetary damages, defendants Eddy, Krisher and Weil are entitled to Eleventh Amendment immunity on plaintiff's official capacity claims.

### C.    Individual Capacity Claims

Plaintiff also claims that the defendant doctors violated his Eighth Amendment rights by denying him medical care between January 2011 and April 2011 and by providing him "detrimental treatment" between April 2011 and February 2012.  *See*, *e.g.*, *Opposition*, pp. 14-21.  To prevail on these claims, plaintiff must establish that these defendants acted with "deliberate indifference to [his] serious medical needs."  *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  Deliberate indifference in violation of the Eighth Amendment contains both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 835-57 (1994).  As for the objective component, a plaintiff must establish a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834.  A medical need is "sufficiently serious" when it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention[.]'" *Santiago v. Ringle*, 734 F.3d 585, 590

(6th Cir. 2013) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). However, when a plaintiff bases a claim on "'the prison's failure to treat a condition adequately,'" *id.* (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004)), "the plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment[.]'" *Id.* (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).

In the case presently before the Court, defendants argue that "[p]laintiff failed to submit any evidence that Defendants caused or allowed his [HPK] to rise to a serious level, and Defendants instead appropriately addressed and provided treatment at all times[.]" *Motion for Summary Judgment*, p. 10. Plaintiff disagrees, contending, *inter alia*, that he entered MaCI with a diagnosis of HPK and a prescription for Soriatane. *Opposition*, pp. 15-21. Plaintiff goes on to argue that he had open fissures or wounds on the bottom of his feet while at MaCI. *Id*. Plaintiff submits medical records to support these assertions, including a doctor's diagnosis of his condition and evidence of severe fissures while incarcerated at MaCI. *See*, *e.g.*, Doc. No. 44-4, 44-5, 44-7, 44-8, 44-10, 44-11, 44-12, 44-13, 44-14, 44-15, 44-16, 44-17, 44-18, 44-24, 44-25. Plaintiff also submits the affidavit and report of his medical expert, Dr. Bozian. *See Bozian Declaration; Bozian Report*. Plaintiff has established the objective prong of his claims. *See Santiago*, 734 F.3d at 590.

Turning to the subjective component, plaintiff must establish that the defendant doctors had a "'sufficiently culpable state of

22

mind,' equivalent to criminal recklessness." *See Santiago*, 734 F.3d at 591 (quoting *Farmer*, 511 U.S. at 834, 839-40).  This component requires more than "mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 835).  More specifically, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  *See also Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

For instance, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703.  Nevertheless, a prison doctor "'has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.'" *Santiago*, 734 F.3d at 591 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).  *See also Estelle*, 429 U.S. at 104 n.10 (citing as an example of deliberate indifference where a prison physician chooses "the easier and less efficacious treatment").  Finally, although a

23

difference of opinion between a prisoner and prison health care providers, or a dispute over the adequacy of a prisoner's treatment, may constitute medical malpractice, that difference or dispute is not sufficient to state a claim for deliberate indifference under the Eighth Amendment. *Id.* at 106; *Apanovitch v. Wilkinson*, No. 01-3558, 32 F. App'x 704, 707 (6th Cir. Feb. 5, 2002) (granting summary judgment to defendants where medical records showed that prison provided plaintiff with orthopedic devices, prescribed pain killers, and ordered diagnostic tests).

In the case presently before the Court, plaintiff contends that the defendant doctors were deliberately indifferent to his HPK in several different ways. First, he argues that they prescribed Methotrexate instead of Soriatane even though Methotrexate was a less efficacious treatment. *Opposition*, pp. 22-26. Plaintiff next contends that the defendant doctors denied him Soriatane for non-medical reasons. *Id.* at 26-30. Plaintiff goes on to complain that the defendant doctors interrupted his prescribed plan of treatment by denying him Soriatane. *Id.* at 30-33. Finally, plaintiff alleges that the defendant doctors ignored a substantial risk of harm from infection when they denied and delayed the administration of Soriatane and instead prescribed Methotrexate. *Id.* at 33-35.

Plaintiff's arguments are not well-taken. As set forth *supra*, the ODRC maintains a Drug Formulary that requires that formulary medications be prescribed before non-formulary medications. *Eddy Declaration*, ¶ 6. The Drug Formulary further requires that a provider submit a request for non-formulary medications and obtain authorization before prescribing non-formulary drugs. *Id.* at ¶¶ 4-6.

In accordance with this Drug Formulary, defendant Krisher, on April 6, 2011, denied defendant Weil's PA request for Soriatane, a non-formulary drug, because Methotrexate, an alternative formulary drug, was available. *Id.* at ¶¶ 7-8; Doc. No. 40-8, PAGEID#:268.[10] Hindsight now reveals that the use of Methotrexate over the next several months was not as efficacious as Soriatane in treating plaintiff's HPK. *See supra*. Plaintiff also offers medical evidence supporting his contention that Soriatane is more effective in treating HPK than Methotrexate. *See Bozian Declaration; Bozian Report*. However, the Court is not persuaded that the present record establishes that the defendant doctors were deliberately indifferent in contravention of the United States Constitution. *See*, *e.g.*, *Curry v. Cuyahoga County*, No. 1:13CV709, 2014 U.S. Dist. LEXIS 137493, at *7 (N.D. Ohio Sept. 29, 2014) (concluding that defendant prison doctor was not deliberately indifferent to the inmate plaintiff when the doctor chose to prescribe a certain medication, which in hindsight proved less efficacious than the plaintiff's previously prescribed medication). Stated differently, plaintiff has pointed to no evidence that any of the defendant doctors knew, at the time that it was prescribed, that Methotrexate, "a medication on the ODRC's Drug Formulary as a treatment for psoriasis and rheumatoid arthritis[,]" *Eddy Declaration*, ¶ 7, would expose plaintiff to a substantial risk of serious harm or that it would otherwise be less efficacious than

---

[10] According to plaintiff, defendant Eddy, as the final medical authority in the approval process, "was also informed that Methotrexate was less efficacious than Soriatane and inadequate, but he continued Mr. Darrah's treatment on Methotrexate." *Opposition*, p. 24 (citing Doc. No. 44-31 (defendant Eddy's deposition transcript in another litigation; *Declaration of Locona Darrah*, Doc. No. 44-3, *Exhibit C*, PAGEID#:390, attached thereto).

Soriatane.

Although plaintiff now avers that he was in "severe pain . . . for the entire period" and that he "regularly informed Defendants of" this pain, *Darrah Declaration*, ¶ 11, the present record reflects that the defendant doctors were not deliberately indifferent to plaintiff's condition.  After plaintiff agreed to try this medicine in April 2011, the defendant doctors monitored and responded to all of plaintiff's documented requests or complaints over the next several months, including providing pain medication.  *See*, *e.g.*, Doc. No. 44-13, PAGEID#:450; Doc. No. 44-14, PAGEID#:451 - PAGEID#:455, PAGEID#:474; Doc. No. 44-16, PAGEID#:459 - PAGEID#:461; Doc. No. 44-22, PAGEID#:468; Doc. No. 51-5, PAGEID#:699 – PAGEID#:700.  The record therefore does not establish that any of the defendant doctors failed to respond to plaintiff's complaints of pain.  Moreover, after a follow-up visit on November 15, 2011, during which plaintiff complained that the Methotrexate had had no effect, a prescription for Soriatane was placed at a non-ODRC pharmacy, albeit at Ms. Darrah's expense.  Doc. No. 44-14, PAGEID#:454 - PAGEID#:455.  Although a "custody issue" delayed plaintiff's receipt of Soriatane, defendants Weil and Eddy took steps to ensure that plaintiff received this medication in February 2012.  Doc. No. 44-7, PAGEID#:418.  Plaintiff continued to receive Soriatane until at least June 2014.  *Id*. at PAGEID#:419 - PAGEID#:422.  In short, although he was initially denied Soriatane, plaintiff was prescribed Methotrexate, an ODRC-approved medication for psoriasis, and was monitored and treated by prison medical personnel while taking this medication.  "Where a prisoner has received some medical attention and the dispute is over the adequacy

26

of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004)) (internal quotation marks omitted). Accordingly, the Court is not persuaded that the present record establishes that the defendant doctors were deliberately indifferent when they prescribed Methotrexate even though, in hindsight, it now appears that that medication was less effective in treating plaintiff's HPK than was Soriatane.

The Court is similarly not persuaded that the defendant doctors were deliberately indifferent when they denied plaintiff Soriatane "for non-medical reasons." *Opposition*, pp. 26-30 (citing *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). As an initial matter, plaintiff's proposition is based on authority from outside this circuit and he has not shown that the Sixth Circuit has ever adopted this standard.[11] Moreover, those cases relate to "the withholding of essential medical treatment from an inmate who refuses to agree to pay because of indigency." *Reynolds*, 128 F.3d at 175 (distinguishing *Lanzaro*, which relied on *Ancata*). In the case presently before the Court, the record

---

[11] Indeed, the Sixth Circuit, in addressing the issue of prisons charging co-payments, has previously concluded that "[c]harging inmates who can pay for medical care does not constitute deliberate indifference[.]" *Washington v. Sommerville*, No. 98-5515, 181 F.3d 106, 1999 U.S. App. LEXIS 8173, at *4 (6th Cir. Apr. 23, 1999) (citing *Reynolds v. Wagner*, 128 F.3d 166, 173-75 (3d Cir. 1997); *Lanzaro*, 834 F.2d at 346)). *See also White v. Corr. Med. Servs.*, No. 03-2097, 94 Fed. Appx. 262, at *264 (6th Cir. Mar. 24, 2004) ("It is constitutional to charge inmates a small fee for health care where indigent inmates are guaranteed service regardless of ability to pay.").

27

does not establish that the defendant doctors withheld "essential medical treatment."  As detailed above, plaintiff received Methotrexate, an ODRC formulary medication approved for the treatment of psoriasis, in lieu of Soriatane, and was routinely monitored and cared for while taking Methotrexate. Although it may be true that "Soriatane is the only medication that has ever successfully treated" his HPK, *id.* at 26, the defendant doctors were not deliberately indifferent merely because they tested that proposition.

Plaintiff's contention that the defendant doctors were deliberately indifferent because they interrupted his prescribed plan of treatment by denying him Soriatane, *id.* at 30-33 (citing, *inter alia*, *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991)), is likewise unavailing.  *Boretti* involved an inmate, recovering from a gunshot wound, who repeatedly sought assistance from nurses who refused to administer the inmate's prescribed treatment plan.  *Boretti*, 930 F.2d at 1152.  In the case presently before the Court, however, plaintiff was prescribed a different medication approved to treat psoriasis. While it is true that plaintiff received Soriatane at LeCI and the defendant doctors did not provide that drug to him upon his transfer to MaCI, this failure to immediately provide Soriatane from the outset of plaintiff's incarceration at MaCI is not dispositive of the subjective prong of plaintiff's deliberate indifference claim.  The Ohio Department of Mental Health ("ODMH") currently regulates all ODRC medications. *Clayton Declaration*, ¶ 5.  However, ODMH did not regulate LeCI until March 2012.  *Id.* at ¶ 6.  Prior to that time,

28

LeCI's contracting physicians were able to prescribe medication from an on-site pharmacy rather than centrally supplied medication. *Id.* at ¶ 7. Conversely, institutions such as MaCI, which "were centrally controlled by ODMH, could not procure non-formulary, non-approved medications" without prior approval. *Id.* at ¶¶ 8-9 (citing ODRC Policy 68-MED-11, Doc. No. 51-4; ODRC Protocol E-I, Section III(21), Doc. No. 40-4, PAGEID#:263). At the time that plaintiff was transferred from LeCI to MaCI, MaCI medical staff were required to first try a formulary medication and request and receive prior approval before prescribing a non-formulary medication. *Id.* at ¶¶ 8-9; *Eddy Declaration*, ¶ 6. Under these circumstances, and for the reasons previously stated, the Court cannot conclude that the defendant doctors were deliberately indifferent when they provided plaintiff with Methotrexate, a formulary medication approved to treat psoriasis, instead of Soriatane. *Cf. Boretti*, 930 F.2d at 1152 (providing essentially no treatment to inmate recovering from gunshot wound).

Finally, plaintiff alleges that the defendant doctors ignored a substantial risk of harm from infection when they denied and delayed the administration of Soriatane and instead prescribed Methotrexate. *Opposition*, pp. 33-35. According to plaintiff, the defendant doctors knew that Methotrexate slows healing and suppresses one's ability to fight infection, that plaintiff had open wounds on his feet, and that other inmates on plaintiff's cellblock had contracted infections. *Id.* As an initial matter, plaintiff offers no evidence that defendant

Krisher was actually aware that other inmates on plaintiff's cellblock suffered from infections. In any event, it is significant that this claim asserted by plaintiff, who is now receiving Soriatane, relates to past events rather than to an on-going denial of the medication. *Cf. Helling v. McKinney*, 509 U.S. 25 (1993)(claim for injunctive relief based on risk of future harm to health may proceed). During the period of time when plaintiff was prescribed Methotrexate, plaintiff was monitored for infection and he did not, in fact, contract an infection. Under these circumstances, it simply cannot be said that the defendant doctors were subjectively indifferent to this risk which, in any event, was not actualized.

For all of these reasons, the Court is not persuaded that the subjective element of plaintiff's Eighth Amendment claim against the defendant doctors has been established. Although plaintiff was initially denied Soriatane, he was nevertheless treated by the defendant doctors and podiatry consults, was provided pain medication and a wheelchair, was sent to medical lay-in for 20 days, was later provided alternative medication approved to treat psoriasis and was monitored while taking that medication. In short, nothing in this record reveals that the defendant doctors were aware of and yet disregarded plaintiff's serious medical needs.[12]

**WHEREUPON**, it is **RECOMMENDED** that *Defendants Eddy, Krisher, Weil*

---

[12] In light of this Court's conclusion that plaintiff has failed to establish a violation of his constitutional rights by the defendant doctrs, the Court need not and does not address these defendants' arguments regarding qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223 (2009); *Saucier v. Katz*, 533 U.S. 194 (2001).

*and the State of Ohio on Behalf of Karen Stanforth's Motion for Summary Judgment*, Doc. No. 40, be **GRANTED in part and DENIED in part**. It is **SPECIFICALLY RECOMMENDED** that, as it relates to defendant Karen Stanforth, the *Motion for Summary Judgment* be **DENIED** without prejudice to the filing of a motion addressing the merits of the claims asserted against her and that, as it relates to defendants Eddy, Krisher and Weil, the *Motion for Summary Judgment* be **GRANTED.**

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


January 15, 2015                              *s/Norah McCann King*
                                              Norah McCann King
                                       United States Magistrate Judge